**In re Patricia Jean POWERS aka Patricia Jean Gillenwater, Debtor.**

**Bankruptcy No. SBX 91–10177 LR.**

United States Bankruptcy Court, C.D. California.

April 29, 1991.

Chris A. Mullin, Simon & Simon, San Bernardino, Cal., for debtor.

Norman L. Hanover, Hanover & Schnitzer, San Bernardino, Cal., for creditor.

MEMORANDUM OF DECISION GRANTING KIMES' MOTIONS TO DISMISS DEBTOR'S CASE AND FOR SANCTIONS; AND DENYING RELIEF FROM THE AUTOMATIC STAY

LYNNE RIDDLE, Bankruptcy Judge.

On April 1, 1991, in the above-entitled matter, Movant Charles Kimes (hereinafter "Kimes" or "Movant") brought on for hearing before the undersigned United States Bankruptcy Judge a motion to dismiss Debtor's case under 11 U.S.C. § 1307(c), a motion for relief from stay pursuant to 11 U.S.C. § 362(d)(1), and for sanctions under Bankruptcy Rule 9011. Norman L. Hanover, Esq. appeared for Movant Kimes; William J. Simon, Esq. appeared for Debtor Patricia Jean Powers (hereinafter "Powers" or "Debtor"). Both motions were based, generally, on allegations that Debtor's petition was filed without good faith. In summary, the Court, finding Movant's allegations of lack of good faith to be correct, granted the motions to dismiss and for sanctions. The motion for relief from stay was denied.

## JURISDICTIONAL STATEMENT

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district) and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges of the Central District of California). The matters resolved herein are core proceedings under 28 U.S.C. § 157(b)(2)(A) and (B).

## STATEMENT OF FACTS

Debtor filed a voluntary petition under Chapter 13, Title 11 U.S.C., on January 7, 1991. Notwithstanding proper notice of the filing, the dates for the § 341(a) and confirmation hearings, and service of a copy of Debtor's proposed plan, no objection was made to the plan by Movant Kimes, and Debtor's proposed plan was confirmed on February 25, 1991.

In her Chapter 13 Statement, Debtor states that at the time of her filing she had been employed for one month as a secretary and sales person at a tire store; she listed her monthly take-home pay as $720.00. Her total monthly income was

listed as $1,870; she stated in her budget that of the total income she receives, $1,150 per month is "help from [a] boyfriend". Her monthly expenses are estimated to be $1,446—leaving a disposable income of $424 per month. Ms. Powers listed no information in her Chapter 13 Statement with respect to a spouse, but stated that she has two dependent children, ages 12 and 3, and that she receives no support for these children.

As to her debts, Ms. Powers listed (a) one priority obligation of $5,000 to state and federal tax agencies for 1984 income taxes; (b) no general unsecured debt; and, (c) three secured debts. Secured creditors include (1) Kacor Development, owed $46,000 and holding a first trust deed on unimproved real property located in Temecula, Riverside County, California (hereinafter "Temecula land"); (2) Movant Charles Kimes, owed $43,143.00 and holding a second deed of trust on the same land (the amount is listed as disputed); and (3) Morris and Sylvia Spitzer (hereinafter "Spitzers"), owed $21,138 and holding a third trust deed on the same Temecula property. Debtor's Statement lists no arrearage due to any secured creditor.

As to her property, Debtor lists a 20% interest in the Temecula land, [with her equity interest estimated by the Court to have an approximate value of $38,000]; household goods valued at $2,000; personal effects having a value of $1,500; and, a cause of action for personal injury with an unknown value. Ms. Powers listed no accounts at any financial institution; no automobile; no right to a tax refund; and, no interest in a partnership or business.

There is no dispute between the parties on virtually any pertinent fact in this case. Ms. Powers received her 20% interest in the Temecula land by grant deed on January 7, 1991—the same day she filed her petition in bankruptcy. The 20% interest was transferred to Ms. Powers by the Spitzers who apparently held a 100% interest in the property prior to the transfer; Spitzers had purchased the vacant land in 1985. Kimes' secured note, assigned to him in February 1985, was all due and payable by the Spitzers on July 23, 1990—more than five months prior to Debtor's receiving her 20% interest and prior to the filing of her bankruptcy petition. The note was not paid when due. On August 22, 1990, Kimes recorded a notice of default, and thereafter a foreclosure sale was set for January 8, 1991. Debtor filed her bankruptcy petition one day prior to the sale and thereby stopped Kimes' foreclosure.

In declarations filed in opposition to the motion to dismiss, Mrs. Spitzer and her son, Alan Spitzer, testified that the Spitzers, who are now in their eighties and Mr. Spitzer is legally blind, attempted prior to the maturity of Kimes' note to arrange for refinancing of the property. But, said Mrs. Spitzer, "[b]ecause of our age, my husband and I were unable to arrange conventional financing on a fully amortized note. We therefore explored other options, including selling a percentage interest in the property in order to *raise some cash to retire the note.*" (Declaration of Sylvia Spitzer, P. 6, ¶ 5) (emphasis added).

And, later Mrs. Spitzer testified:

"In October, 1990, we discussed with [Debtor] the possibility of selling her an interest in the property. We did not come to specific terms but we agreed in principal. ... we agreed to sell her a 20% interest for ... $36,000.00."

"In the meantime, I continued my attempts to arrange financing."

"It finally turned out that we were *not able to arrange other financing in time to avoid a foreclosure. Therefore,* we sold a 20% interest to [Debtor] for a principal reduction payment of $10,000 and a note on the property for another $21,000.00."

(Declaration of Sylvia Spitzer, P. 6–7, ¶¶ 6–8) (emphasis added).

In Ms. Power's declaration in opposition to the motion to dismiss, she explained that for several months prior to her filing she "had been working with [the Spitzers], and their son ..., in an attempt to arrange refinancing of the property in Temecula. ..." (Declaration of Patricia Jean Powers, P. 8, ¶ 2). Thereafter, she continued by saying that

"I believed that I would be able to borrow the money from my mother-in-law. Specifically, we agreed that I would buy a percentage interest in the property."

"It turned out that I was not able to borrow the money from my mother-in-law. Instead, I was able to arrange a loan through a friend. However, this loan finally fell through.... Eventually, I was able to borrow $10,000.00 from another friend which I used, along with a note on the subject property, to buy a 20% interest in the property."

*Id.* P. 8–9, ¶¶ 2–3.

In both his motion to dismiss and for relief from stay, Kimes asserts that *since* Debtor's petition was filed (1) on the very same day that she received her interest in the Temecula land, and (2) only one day prior to the date of the foreclosure sale, *and since* the Spitzers were (3) in default of their duty to pay the balance of the all due note, and (4) apparently unable to obtain conventional financing in order to stop the foreclosure, then it must be concluded the transfer of the partial interest to Ms. Powers, and Ms. Powers' immediate filing for bankruptcy, was for the sole purpose of stopping the foreclosure. Those circumstances, argued Mr. Kimes, are sufficient indicia of Debtor's lack of good faith at the time of her filing that her petition should be dismissed, in the first instance, and on the same facts there is sufficient "cause" to grant relief from the automatic stay and award sanctions.

Further, in his motion to dismiss, Mr. Kimes asserted that there are additional facts which the Court may take as evidence of Debtor's lack of good faith. These include: (1) Debtor's plan provides only for two debts; a small tax obligation ($5,000) and the Kimes $44,000 past due note; (2) Debtor has no debts other than her tax debt and those incurred with respect to the Temecula land; (3) Debtor's plan fails to provide for payments to the holder of the first deed of trust; and, (4) Debtor's plan failed to make adequate provision to pay off the full value of the Kimes note.

Debtor defends against the bad faith arguments on three grounds. First, Kimes is raising issues of good faith which are in essence objections to the confirmation of the plan. Such tactic is impermissible, claims Debtor, because following noticed hearing the plan has been confirmed, Kimes has waived his right to object, and he is now bound by the confirmed plan and his treatment under it pursuant to § 1327(a). Second, Powers asserts lack of good faith is not a basis to dismiss a case under § 1307. And third, she says the questioned transfer of the interest in the Temecula land did not take place the same day as the filing, only the deed of trust was filed and signed on the day of filing. Actually, argues Ms. Powers, several months prior to her filing, and by virtue of her oral agreement with Spitzers, she had a contractual right to purchase an interest in the property which was merely exercised or perfected on the day of her filing. These circumstances must be differentiated, asserts Ms. Powers, from the bad faith "new debtor syndrome" cases cited by Kimes as authority to dismiss the case.

Mr. Kimes has offered the Court no reason why he did not object to confirmation of the plan.

## STATEMENT OF THE ISSUES

Whether Kimes, by his failure to object to confirmation of Powers' proposed Chapter 13 plan, waived his right to move under Section 1307(a) to dismiss Powers' case on the ground that it was filed without good faith and for an improper purpose?

Whether Debtor's case was filed without good faith?

Whether, if Debtor's case was filed without good faith, Kimes' motion to dismiss should be granted?

Whether, if Debtor's case was filed without good faith, Kimes' motion for relief from the automatic stay should be granted?

Whether, if Debtor's case was filed without good faith, Kimes is entitled to recover from her and her attorney his reasonable attorney's fees and costs incurred in ob-

taining the dismissal and/or relief from stay order(s)?

## DISCUSSION

### 1. *Waiver of "lack of good faith" argument*

▮ Powers' primary defense to the motion to dismiss is that Kimes is not truly seeking dismissal under § 1307, but rather is attempting, belatedly, to object to confirmation of her plan under § 1325. (Powers' Memorandum of Points and Authorities, Filed March 21, 1991, P. 4, lines 6–7, P. 5–8, lines 28–16). She says: "[T]he most serious problem facing Movant, with his 'lack of good faith' argument, is the fact that this Motion was filed too late to test that issue," because under § 1327(a) the terms of the confirmed plan bind both debtor and creditors. (*Id.* P. 5–6, lines 28–2). Powers goes so far as to assert that "[T]his Court has no jurisdiction to hear Movant's allegations about the alleged lack of good faith.... The plan has already been confirmed without objection." (*Id.* P. 8, lines 10–12, 15–16).

In support of her argument Powers cites *In re Szostek*, 886 F.2d 1405 (3d Cir.1989), *In re Gregory*, 705 F.2d 1118 (9th Cir. 1983), and *In re Webre*, 88 B.R. 242 (9th Cir. BAP 1988). These cases all stand for the proposition that if a creditor, having received notice of a Chapter 13 filing and plan confirmation hearing, fails to object to the confirmation of debtor's plan, such failure constitutes an acceptance of the plan as confirmed, and thereafter, the order confirming the plan is res judicata as to all issues litigated and which could have been litigated. As will be seen below however, none of these cases is applicable to the question raised in our case, i.e., whether, because Powers' plan is confirmed, Kimes is prohibited from bringing a motion to dismiss her case under § 1307.

Powers first relies on *Szostek*, and repeats the Third Circuit's approval of language from *Collier*, as follows:

"[I]t is quite clear that the binding effect of a chapter 13 plan extends to any issue actually litigated by the parties and any issue necessarily determined by the confirmation order, including whether the plan complies with sections 1322 and 1325 of the Bankruptcy Code. For example, a creditor may not after confirmation assert that *the plan* was *not filed in good faith*, ...; that the creditor should have been paid interest; that the debtor is ineligible for chapter 13 relief; or that the plan is otherwise inconsistent with the Code in violation of section 1322(b)(10) or section 1325(a)(1)."

*In re Szostek*, 886 F.2d 1405, 1409 (3d Cir.1989) (citing 5 *Collier on Bankruptcy* § 1327.01 (15th ed. 1988)) (emphasis added).

The *Szostek* decision can be fairly summarized to state that if a creditor fails to object to the confirmation of debtor's plan, and the plan is confirmed, that thereafter, neither a creditor, nor the trustee, nor the court, can re-examine the plan, or vacate confirmation, if it is found to be non-conforming with § 1325(a). What Ms. Powers has failed to set forth with regard to *Szostek*, and the other authorities she cites, is the full context of the decision. Once this is done, their inapplicability to our question is readily apparent.

In *Szostek*, creditor Kissell, with full knowledge of the content of the proposed plan and date set for the confirmation hearing, failed to file an objection, and the plan was confirmed. The plan failed to provide sufficient interest on Kissell's claim and therefore failed to comply with the express requirements of § 1325(a)(5)(B)(ii) that a secured creditor receive "present value". Moreover, after learning of the confirmation order, Kissell took no immediate action to challenge the order of confirmation in the trial court, neither did he file an appeal. Rather, he waited four months, and filed a motion to revoke confirmation under § 1330, or in the alternative, moved for modification of the plan or relief from stay. [At this point, *Szostek* is distinguishable from the case before us because Kissell brought no motion to dismiss the case under § 1307 based on the lack of debtors' good faith.]

The question resolved by *Szostek* was whether, after confirmation, a creditor

could successfully move to vacate the order of confirmation on the basis that the trustee and court failed to verify whether debtor's Chapter 13 plan met the requirements of § 1325(a). The issue was: Is the policy of finality as expressed in § 1327 [providing that absent fraud the confirmation of a plan binds both debtor and creditors] more or less important than the language of § 1325(a) which sets forth the conditions a plan must satisfy in order to be confirmed? Or, as the Court defined its inquiry:

> "[W]e must determine whether, in the absence of fraud, the failure of a creditor to attend the confirmation hearing, object timely to the plan, or appeal the order of confirmation, regardless of the reason, precludes the creditor from obtaining full recovery of the present value of its claim when such was not provided in the confirmed plan." *Id.* at 1408.

*Szostek* concluded that (1) "finality" is the rule, and (2) the provisions of § 1325(a) are not mandatory, and neither the court nor the trustee has an independent duty to examine the plan for compliance with § 1325(a). Therefore, even if a plan is confirmed without compliance with § 1325(a), that confirmation cannot be disturbed absent fraud.

For further support, Ms. Powers points out that *Szostek* "[A]ffirmed, and extended the holding in a Supreme Court case, *Stoll v. Gottlieb*, 305 U.S. 165 [59 S.Ct. 134, 83 L.Ed. 104 (1938)] to Chapter 13 plans. In the *Stoll* case the Supreme Court would not allow *further litigation* after a Plan had been confirmed, where the creditor could have objected to the Plan but failed to do so." (Power's Memorandum of Points and Authorities, Filed March 21, 1991, P. 7, lines 1–5) (emphasis added). And, Debtor continues that other Circuit Court decisions have come to the same conclusion, in her words, "[T]hat even if the Plan was inconsistent with bankruptcy law or the authority of the Bankruptcy Court, if the Plan was confirmed without objection then it is not reviewable." (Memorandum of Points and Authorities, March 21, 1991, at P. 7, lines 9–11).

Debtor is correct that *Stoll* supports *Szostek*, and numerous cases, regarding the finality of the terms and conditions in confirmed plans. But let's look more closely at the question in *Stoll*.

The issue resolved in *Stoll* arose from the fact that corporate debtor's confirmed plan included a provision cancelling the personal guaranties of O.L. Stoll and S.A. Crowe to pay a bond. The affected bondholder/creditor filed no objection to the plan. But, after confirmation, the creditor sued Stoll and Crowe in state court to recover on the guaranty. The Supreme Court held that the provisions of the confirmed plan were res judicata, or as the Court in *Szostek* said: "The Supreme Court held that the finality of the bankruptcy confirmation order barred the creditor from litigating its claim." *Id.* at 1409. What Gottlieb, the creditor in *Stoll*, was apparently asserting was that he was not bound by the provision in the confirmed plan cancelling the guaranty. Gottlieb was therefore arguing that the provision in the confirmed plan was erroneous, and he had a right to litigate the question of his treatment. The Supreme Court held that, no, he had no further right to question his treatment under the plan.

Later in Powers' opposition to the motion to dismiss her case, she states: "The law is clear in this Circuit that if a creditor does not object at confirmation, the creditor looses [sic] all rights to later object to the Confirmation issues of a Plan." (*Id.* P. 8, lines 23–26). As further authority for her position, Debtor cites *In re Gregory*, 705 F.2d 1118 (9th Cir.1983), and argues that the same issues raised in this proceeding were those expressly addressed by *Gregory*. Debtor is in error. The question, as explained below, is not the same.

In *Gregory* debtor filed a Chapter 13 case. At the time, Lawrence Tractor Company, a creditor, had earlier obtained a $17,000 state court judgment for embezzlement against Gregory. In proposing his plan debtor divided creditors into seven groups; Lawrence was in a group of unsecured creditors. Debtor's plan expressly provided that he would pay nothing to this

group. While Lawrence received notice of the meeting of creditors and confirmation hearing, it was represented at neither. At the hearing the bankruptcy judge confirmed the plan. Two months after confirmation, Lawrence filed an adversary complaint objecting to the dischargeability of the debt. The complaint was dismissed on a finding that the debt had been provided for in the confirmed plan and was dischargeable under § 1328(a). The only issue raised on appeal relevant to the question now before this Court is: Whether, after the order confirming the plan became final, Lawrence was precluded from challenging its legality in proceedings to determine the dischargeability of its claim?

In support of her position, Powers quotes from *Gregory*, as follows:

"However, this court need not rule on the legality of zero-percent plans in general or of Gregory's in particular. The order confirming the plan has become final. Lawrence's failure to raise this question at the confirmation hearing or to appeal from the order of confirmation should preclude its *attack* on the *plan* or *any provision* therein as illegal in a subsequent proceeding."

"This was the approach of the bankruptcy appellate panel, which correctly stated that it was without jurisdiction to consider Gregory's *'good faith'* objection to *the plan*. 'Questions of this sort should have been raised at the time of confirmation and by appeal immediately thereafter. The time for appeal on the issue of good faith had long past when the instant adversary proceeding was instituted.' " *Id.* at 1121 (emphasis added).

The bottom line in *Gregory*, which Powers argues applies here, is that since the order confirming Powers' plan is final, Kimes cannot challenge its legality in proceedings to determine dischargeability, or in any other motion attacking the content of the plan. But, again, as we shall discuss below, Kimes has not raised a question regarding dischargeability; neither has he, by his motion to dismiss, attacked the content of Debtor's plan.

Finally, Debtor, in her supplemental response, argues that to file a motion to dismiss her case based upon allegations that the confirmed plan was not filed in good faith, is sanctionable as being frivolous and untimely under *In re Webre*, 88 B.R. 242 (9th Cir. BAP 1988). In *Webre* a creditor named Walters had, some five years prior to the filing, obtained a state court judgment for assault and battery against debtor in a sum of $30,000. Debtor filed a voluntary Chapter 13 in July 1985; in October 1985 the plan was confirmed. At that same time Walters filed an adversary pleading objecting to the dischargeability of the judgment obligation. In July 1986 Debtor brought a motion for summary judgment within the adversary case on the ground that under 11 U.S.C. § 1328 the claim was not excepted from discharge. Thereafter Walters filed a motion for summary judgment and a motion to re-open the Chapter 13 confirmation hearing. These last pleadings were not timely and were stricken.

At the hearing on the summary judgment motions the court found that Walters had proper notice of the confirmation hearing and should have filed an objection at that time. Thereafter, the Court opined that even were these issues presented at the confirmation hearing, they would have had no effect on confirmation, and further held that the confirmed plan was binding on all creditors as to all issues raised at the confirmation hearing. The court found the complaint stated no claim upon which relief could be granted, granted debtor's summary judgment motion and dismissed Walter's adversary complaint.

Then, in March 1987, Walters filed a *complaint* to dismiss or convert the case and to determine the dischargeability of the debt. Debtor again filed a motion to dismiss the adversary proceeding. Neither Walters nor her father, Holloway, who moved to intervene, filed any opposition to the motion to dismiss the adversary complaint. Walters and Holloway were thereafter, under local procedural rules, prohibited from opposing the motion to dismiss. The trial court dismissed the complaint and

awarded sanctions for the filing of a frivolous pleading.

The only two issues addressed in the *Webre* appeal were:

1. Whether the Court erred in finding that Walters and Holloway, by failing to file opposition, had waived their right to oppose the motion to dismiss the adversary complaint? And,

2. Whether the Court erred in imposing sanctions against Walters and Holloway for filing a frivolous complaint.

With respect to these questions, the Panel held:

"We agree with the bankruptcy court that the complaint filed by Walters, to which her father intervened, was frivolous. *The majority of the complaint focuses on objections to the confirmation of the plan.* However, the debtor's plan was confirmed on October 15, 1985, the confirmation was not timely objected to by Walters, nor was an appeal taken from the confirmation. Walters' objections to confirmation via the complaint filed on March 26, 1987 are untimely and frivolous" (emphasis added).

"A portion of the complaint asserts arguments which were made and ruled upon by the bankruptcy court pursuant to Walters' [earlier] complaint to determine nondischargeability of debt." [That complaint was dismissed following hearing, and that order was appealed.]

" 'Without question, successive complaints based upon the same proposition of law previously rejected may constitute harassment under Rule 11.' *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 832 (9th Cir.1986). Incorporated in the complaint is a *motion to dismiss the case* or convert it to a Chapter 7. However, the *complaint lists no grounds to* convert or *dismiss* as set out in 11 U.S.C. § 1307."

*Id.* at 245 (emphasis added).

*Webre* has no application to the case now before us. Sanctions were awarded in that case because following confirmation, and where no appeal was taken, Ms. Walters filed two successive adversary complaints alleging the same grounds for relief that had previously been held meritless by the court. That was the basis for the "untimely and frivolous" finding—not because following the confirmation she filed a complaint to dismiss. The Appellate Panel stated expressly stated that the majority of the complaint focused on "objections to ... confirmation" and that the complaint listed no grounds sufficient for dismissal under § 1307. Creditor Walters did nothing in the case but repeatedly attack the propriety of the treatment of *her claim*—she never alleged facts showing entitlement to dismissal; she apparently never raised an issue as to Webre's improper motive for filing.

The *Gregory* inquiry was also one into the internal provisions, or lack thereof, of debtor's plan. And more specifically, the *Gregory* question was whether Gregory's proposed "zero-percent to unsecured creditors" plan was proposed in good faith as required under § 1325(a)(3). "Zero-percent" is an express provision of the plan. The inquiry then is into the *bona fides* of a provision proposing to pay nothing to some group of creditors in a Chapter 13 case while paying off secured creditors and retaining one's assets. And the court held that the time to inquire into debtor's "good faith" with respect to express provisions of the plan expires after the order of confirmation is final and no appeal is taken.

The clear conclusion to be drawn from Ms. Powers' opposition to the motion to dismiss, is that while she is generally correct as to what her cited cases stand for, none of them address the issue raised in this case. What Debtor seems to imply— that once the Chapter 13 plan is confirmed, the movant is proscribed from bringing *any* other kind of motion seeking relief, including by inference, a motion to dismiss the case on "lack of good faith" grounds under § 1307—is not the holding, or the rule, or the conclusion, of any of her cited cases. They all deal with attempts by creditors to collaterally attack the express provisions of a confirmed plan—by way of a separate state court proceeding, by way of an adversary proceeding seeking a determination that the underlying debt is non-dis-

chargeable, or by way of motion to modify or amend the plan.

Kimes' motion does not seek to modify his treatment under the confirmed plan—he does not question *the plan* or the *bona fides* of debtor in proposing it. He simply argues that the petition itself, based upon debtor's pre-petition acts and motives, shows that the whole bankruptcy petition was filed to achieve an improper purpose, and therefore the case in its entirety must be dismissed. This Court finds that the cases upon which Debtor has relied have no applicability to that question and are therefore irrelevant to this proceeding.

Again, Kimes motion does not propose inquiry into express provisions of the plan and a testing of those provisions against requirements for confirmation. Kimes motion does not focus on the *bona fides* of particular provisions or treatment under a plan, but on the *bona fides* of debtor's acts prior to her filing and the *bona fides* of her motive at the time of filing. The question is: Did Ms. Powers intend, at the time she contemplated her bankruptcy filing, to obtain Chapter 13 relief to achieve a purpose intended by the framers of the Bankruptcy Code? If the answer is "Yes", then she has failed in good faith; If the answer is "No", then we must conclude that she has filed without good faith. Debtor has failed to make a critical distinction between questions of "good faith" raised with respect to the *filing of a plan* (issues under § 1325), and questions of "good faith" raised with respect to the *filing of the petition* (issues under § 1307).

Moreover, Debtor has cited no authority for the argument that Kimes has waived his right to object to Debtor's lack of good faith in filing, and for her conclusion that the Court is deprived of jurisdiction to entertain and decide Movant's later motion to dismiss her case. Nor has the Court located any such authority. I conclude that the Court is not deprived of its jurisdiction to hear a motion under § 1307, and Kimes has not waived his right to bring it.

There are perhaps several reasons why failure to object to the *bona fides* of debtor's plan should not proscribe a later in-

quiry into debtor's *bona fides* at the time of filing of the petition. Primarily, however, this court believes there are two separate interests being protected under Sections 1325(a) and 1307—and different time limitations applicable to raising issues under these sections is appropriate. The first protected interest has to do with the right of creditors and trustee to object on compliance grounds and the treatment they will receive under the plan proposed. A second interest to be protected is that of the court, the trustee, the Office of the United States Trustee, and creditors to object where the Code and bankruptcy courts are being misused and/or abused for an improper purpose.

This Court has found no authority which sets a deadline as to the time during which a motion to dismiss a Chapter 13 case must be brought. Since this is a court of equity, one can only surmise that the proper time requirement would be "within a reasonable time"—where reasonable would be determined on a "case by case basis" and after consideration of "all the circumstances" of the case.

Furthermore, since bankruptcy is to be an expeditious process to enable debtors to quickly obtain the benefits of their "fresh start", it appears sensible to require creditors to object to their treatment under a proposed plan within a short period after learning of their proposed treatment. At the time of the filing creditors should already know the nature and extent of their claim, and they may thereafter make ready reference to the Code to determine whether their proposed treatment is in compliance with Section 1325(a) requirements.

But, an inquiry with respect to whether a debtor's petition was *filed* in good faith may entail examination into numerous areas outside the creditors' own books and records, and into the "murkier" area of debtor's motives. One might delve into the accuracy, completeness, and fullness of disclosure of debtor in his or her Chapter 13 Statement with respect to assets, liabilities, income and expenses, and with respect to debtor's pre-filing conduct and transactions. It may require, thereafter, verifica-

tion of debtor's responses by resort to third party inquiry. This process would require considerably more time and expense than merely examining one's own treatment under the plan.

Since it is the duty of debtor to make full disclosure, where this is lacking in any significant respect, and where such lack of candor or accuracy raises legitimate questions regarding debtor's lack of good faith in filing, then the burden must fall to the debtor who claims the time to question debtor's "good faith" at filing has expired to show that some lack of diligence on the part of the creditor outweighs the debtor's lack of candor.

Moreover, it is instructive to note that several cases have held with respect to a Chapter 11 case, that the court has the power *sua sponte* to dismiss or convert a case—not for administrative reasons as set forth in § 1112, but for "judicial reasons" such as bad faith, and where to do so perpetuates the proper use of bankruptcy law. *See In re Ray,* 46 B.R. 424 (S.D.Ga. 1984); and *In re Moog,* 46 B.R. 466 (N.D.Ga.1984) (citing *Jefferson Fourteenth Ass'n v. Wometco de Puerto Rico, Inc.,* 695 F.2d 524, 526 (11th Cir.1983)); *see also In re Clark,* 107 B.R. 376 (S.D.Fla.1988); *In re Coram Graphic Arts,* 11 B.R. 641 (Bankr.E.D.N.Y.1981). Such holdings are in accord with 1 *Moore's Federal Practice* ¶ 0.6[6] (2d ed. 1989), that all courts have inherent power to protect their jurisdiction from abuse. It would seem anomalous that the court has the power to dismiss a case *sua sponte* for bad faith, and particularly where material omissions occur in debtor's stataments or schedules, but restrict the court, or other appropriate parties, as to the amount of time to learn the true facts and raise the issue.

Finally, we might return to the place where Ms. Powers first looked for authority in her defense, *Collier.* At 5 *Collier on Bankruptcy* § 1327.01 at 1327–2 (15th ed. 1990), we are instructed that:

"The provisions of a confirmed chapter 13 plan bind the debtor and all creditors. It makes no difference whether the creditor is provided for by the plan, or has accepted, rejected, or objected to the plan. Upon becoming final, the order confirming a chapter 13 plan represents a binding determination of the rights and liabilities of the parties as ordained by the plan. Absent timely appeal, the confirmed plan is res judicata and its terms are not subject to collateral attack. The *res judicata effect of confirmation* may be *eliminated only if* confirmation is *revoked,* or if the case is later *dismissed* or *converted* to another chapter." (Emphasis added).

This Court concludes that Kimes is not proscribed from bringing a motion to dismiss Ms. Powers' Chapter 13 case based upon the argument that it was filed without good faith and for an improper purpose.

### 2. *Dismissal*

■ 11 U.S.C. § 1307(c) begins by providing that

... [O]n request of a party in interest or the Office of the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, *including—*

(Emphasis added).

Thereafter, Section 1307(c) lists ten enumerated "causes", but does not specifically designate debtor's lack of good faith as an "included" cause for dismissal. Debtor's claim that "reasonable interpretation" supports the conclusion that Congress intended that "cause" for dismissal under § 1307(c) be limited to the enumerated ten causes is without legal support or authority. On the contrary, there is clear authority for the opposite view.

While nothing in the Bankruptcy Code expressly requires a showing of good faith by a debtor as a prior condition to his or her right to relief under any bankruptcy chapter, it is now well established in the Ninth Circuit, and numerous other courts, that the lack of good faith in commencing a case is "cause" for dismissal of a Chapter 11 case under § 1112(b). *See In re Ar-*

*nold,* 806 F.2d 937, 939 (9th Cir.1986); *In re Can–Alta Properties, Ltd.,* 87 B.R. 89, 91 (9th Cir. BAP 1988); *In re Walter,* 108 B.R. 244 (Bankr.C.D.Cal.1989). Since the matter now before the Court is not a Chapter 11 case, it is important to notice that the language of § 1307(c), under which Kimes brought his motion, is essentially the same as that of § 1112(b), applicable to dismissal in Chapter 11 cases.

Indeed, many courts have held that debtor's lack of good faith in filing a Chapter 13 case is, likewise, "cause" for dismissal under § 1307(c). *See In re Hundley,* 99 B.R. 306, 308 (Bankr.E.D.Va.1989) ("[L]ack of good faith is sufficient ground upon which to either dismiss the Chapter 13 case or deny confirmation of a plan."). *See also In re Fulks,* 93 B.R. 274, 276 (Bankr. M.D.Fla.1988); *In re Lawson,* 93 B.R. 979 (Bankr.N.D.Ill.1988); *In re Newsome,* 92 B.R. 941, 943 (Bankr.M.D.Fla.1988); *In re Mountcastle,* 68 B.R. 305 (Bankr.M.D.Fla. 1986); *In re Setzer,* 47 B.R. 340 (Bankr. E.D.N.Y.1985); *In re Ratmansky,* 7 B.R. 829 (Bankr.E.D.Pa.1980).

For the foregoing reasons, Debtor's assertion that § 1307 does not include lack of good faith at the time of debtor's filing as a ground for dismissal, is without merit.

### 3. *Good faith in Chapter 11*

Whether the required good faith exists in any bankruptcy case depends upon the facts and circumstances presented; no single fact can be given preeminence in making the decision. *In re Thirtieth Place, Inc.,* 30 B.R. 503 (9th Cir. BAP 1983). Lack of good faith in Chapter 11 cases has been variously defined—

"If it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist. But if it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administrative expenses ... to mortgage foreclosures, and to invoke the operation of the [bankruptcy law] ... to attempt to effect a speedy efficient reorganization, upon a feasible basis ... good faith cannot be denied."

*In re Loeb Apartments,* 89 F.2d 461, 463 (7th Cir.1937); *see also In re Thirtieth Place, Inc.,* 30 B.R. 503 (9th Cir. BAP 1983); *In re Yukon Enterprises, Inc.,* 39 B.R. 919 (Bankr.C.D.Cal.1984).

"A petition filed in bad faith may manifest an intent to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize [one's] financial activities."

*Thirtieth Place,* 30 B.R. at 505.

"When confronted with 'badges of bad faith' courts will scrutinize the conduct of the debtor to determine whether the filing of the petition constituted an abuse or misuse of bankruptcy jurisdiction. The test of the debtor's good faith is not whether a transfer of property and/or a change of entity occurred on the eve of filing; timing of the change and/or transfer is not controlling. The question is whether any substantive or procedural rights of creditors available prior to transfer have been altered or eroded by the transfer and subsequent filing. It is detriment to creditors, not the advantage to prior owners which has the greater relevance in determining whether creditors are fraudulently hindered or delayed by the filing."

*Duggan v. Highland–First Avenue Corporation,* 25 B.R. 955, 962 (Bankr.C.D.Cal. 1982) (citations omitted).

*In re Yukon Enterprises, Inc.,* 39 B.R. 919, 921 (Bankr.C.D.Cal.1984), identified some common badges of bad faith where there has been a transfer of distressed real property followed immediately by the filing of a bankruptcy case by the transferee. These include:

1. The transfer of distressed real property into a newly created or dormant entity, usually a partnership or corporation;

2. The transfer occurring within close proximity to the filing of the bankruptcy case;

3. No consideration being paid for the transferred property other than stock in the debtor;

4. The debtor having no assets other than the recently transferred, distressed property;

5. The debtor having no or minimal unsecured debts;

6. The debtor having no employees and no ongoing business; and,

7. The debtor having no means, other than the transferred property, to service the debt on the property.

Some other indicia of bad faith include filings where debtor has—

a—a frivolous purpose, without any economic reality as a basis;

b—a lack of an honest and genuine desire to use the statutory process to effect a plan of reorganization;

c—used bankruptcy as a device to further some sinister or unworthy purpose; and/or

d—abused the judicial process to delay creditors or escape the day of reckoning in another court.

*Furness v. Lilienfield,* 35 B.R. 1006, 1011 (D.Md.1983).

### 4. *Good faith in Chapter 13*

■ "Good faith" in a Chapter 13 proceeding must be identified and defined on a case-by-case basis. *In re Rimgale,* 669 F.2d 426, 431 (7th Cir.1982). At a minimum, good faith requires debtor to show an honest intention. *In re Bingham,* 68 B.R. 933, 935 (Bankr.M.D.Pa.1987) (citing *In re Setzer,* 47 B.R. 340, 344 (Bankr. E.D.N.Y.1985)). The facts required to find sufficient indicia of bad faith warranting dismissal are as varied as the number of cases raising the issue. *In re Zahniser,* 58 B.R. 530 (Bankr.D.Colo.1986).

One of the first Ninth Circuit decisions regarding good faith in the context of a Chapter 13 filing, but in connection with making a determination of whether debtor's plan which would pay one percent to unsecured creditors was proposed in good faith, is *In re Goeb,* 675 F.2d 1386 (9th Cir.1982). As a general principle, and with respect to the question of bad faith, the Court said:

"[W]e believe that the proper inquiry is whether the [debtors] acted equitably in proposing their Chapter 13 plan. A bankruptcy court must inquire whether a debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan an inequitable manner." *Id.* at 1390.

And later, at footnote 9, the Court reiterated its concern that "[A]n important consideration is whether the debtor misrepresented material facts in his plan". *Id.*

■ The applicability of good faith requires examination into *any abuses* of the provisions, purpose, or spirit of bankruptcy law and into whether the debtor honestly needs the liberal protection of the Bankruptcy Code. *In re Bingham,* 68 B.R. 933, 935 (Bankr.M.D.Pa.1987) (citing *In re Setzer,* 47 B.R. at 340) (emphasis added). And while no one factor predominates in finding bad faith, some of the elements found in Chapter 13 cases include the following:

1. The debtor has few or no unsecured creditors.

2. There has been a previous bankruptcy petition by the debtor or a related entity.

3. The pre-petition conduct of the debtor has been improper.

4. The petition effectively allows the debtor to evade court orders.

5. There are few debts to non-moving creditors.

6. The petition was filed on the eve of foreclosure.

7. The foreclosed property is the sole or major asset of the debtor.

8. There is no possibility of reorganization.

9. Debtor's income is not sufficient to operate.

10. There is no pressure from non-moving creditors.

11. Reorganization essentially involves the resolution of a two-party dispute.

12. The debtor filed solely to obtain the automatic stay.

*In re Grieshop,* 63 B.R. 657 (N.D.Ind.1986).

Some other common questions to be asked in making a determination as to debtor's good or bad faith may include:

a. Are there deficiencies and/or inaccuracies in the debtor's statement and plan that could be construed as an attempt by debtor to mislead the court?

b. Are the payments proposed in the plan fundamentally fair? [This may include considerations of the timing of the filing and the amounts proposed to be paid].

c. Did the debtor have an improper motive in seeking relief? [It is appropriate here to consider the manner in which the debts were incurred].

d. Under the "totality of circumstances", has there been an abuse by debtor of the provisions, purposes and/or spirit of Chapter 13?

*In re Lawson,* 93 B.R. 979, 986 (Bankr. N.D.Ill.1988) (citing 9 *Collier on Bankruptcy* ¶ 9.20 at 319 (14th ed. 1978)); *In re Smith,* 848 F.2d 813 (7th Cir.1984); *In re Rimgale,* 669 F.2d 426 (7th Cir.1982); *In re Terry,* 630 F.2d 634 (8th Cir.1980) [the foregoing cases involved issues of debtor's good faith in proposing a Chapter 13 plan].

In *In re Newsome,* 92 B.R. 941 (Bankr. M.D.Fla.1988), where debtor filed a Chapter 13 petition solely to be relieved of a contract which he later considered burdensome and oppressive, the court found the filing lacked the requisite good faith. Debtor had but one unsecured creditor to whom he owed money for the purchase of business assets, and filed the bankruptcy for the sole purpose of scaling down and restructuring the terms of the purchase agreement. The court said:

"There is hardly any doubt that the remedial provisions of this Chapter were never designed to accomplish such goals especially when debtors like the Debtor in [*In re*] *Waldron* [785 F.2d 936 (11th Cir.1986)] and in the present case actually have no real need for readjusting their debts simply because they have none other than the one involved in the case."

*Id.* at 944.

In *In re Waldron,* 785 F.2d 936, 938 (11th Cir.1986), debtors' Chapter 13 petition was dismissed on a finding that the plan was not proposed in good faith. Debtors were completely solvent and in fact owed no debt; debtors were not financially distressed. Their petition listed only one creditor, Shell Oil Company, but in fact they owed Shell nothing.

Debtor husband, an attorney specializing in bankruptcy law, filed the petition for the sole purpose of rejecting a land purchase option contract which Shell Oil could exercise by the payment of $40,000—while Shell later paid $100,000 for the same option agreement on an adjacent parcel and debtor knew that Shell's projected development required both parcels. "Financially secure and without any debts," said the Court, "... the Waldrons thus set out to use the bankruptcy process in attempting to reject a contract which they felt might not be as profitable as it could be." *Id.* at 938. Because the Waldrons were not in financial distress and had no need of the protection, but manipulated and abused the bankruptcy process only "to enhance their [own] financial coffers" and for a "greedy and unworthy purpose," their case was dismissed for bad faith. *Id.* at 940–41. Citing *In re Penn Central Transportation Co.,* 458 F.Supp. 1346, 1356 (E.D.Pa.1978), *Waldron* reminds us that "[t]he bankruptcy laws are intended as a shield not a sword." *Id.* at 940. At the end of its opinion, the Eleventh Circuit admonished bankruptcy judges to be vigilant in examining a debtor's motives. It said:

"We hold that with section 1325(a)(3) [requiring debtor's plan to be proposed in good faith] Congress intended to provide bankruptcy courts with a discretionary means to preserve the bankruptcy process for its intended purpose. Accordingly, whenever a Chapter 13 petition appears to be tainted with a questionable purpose, it is incumbent upon the bankruptcy courts to examine and question the debtor's motives. If the court discovers unmistakable manifestations of bad faith, as we do here, confirmation must be denied."

"Unmistakable manifestations of bad faith need not be based upon a finding of actual fraud, requiring a finding of malice, scienter or intent to defraud. We

simply require that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to condone its abuse."

*Waldron,* 785 F.2d at 941.

■ Other courts agree with *Waldron* that neither malice nor actual fraud is required to find a lack of good faith. The bankruptcy judge is not required to have evidence of debtor illwill directed at creditors, or that debtor was affirmatively attempting to violate the law—malfeasance is not a prerequisite to bad faith. Rather, the court may find a lack of good faith where the debtor "used the [bankruptcy] process in a way that the underlying policy of securing an orderly and fair adjustment of the relationship between debtor and creditors could not be realized. This constitutes a lack of good faith...." *In re Grieshop,* 63 B.R. 657, 663 (N.D.Ind.1986). Where a debtor utilizes the automatic stay without the intent or ability to reorganize their financial affairs or to perform a realistic payment plan, they are abusing the bankruptcy system and the case must be dismissed. *In re Kinney,* 51 B.R. 840, 845 (Bankr.C.D.Cal.1985).

In *Waldron* the filing was not proper because debtors were not in distress, i.e. they were not seeking to be shielded from a financial disaster or harm—they needed no rehabilitation.

From the other end of the spectrum, courts have found a lack of good faith exists where at the outset of the case debtor is not an economically viable entity and it is clear that the bankruptcy petition was filed for no purpose other than to delay or frustrate foreclosure. *In re Asbridge,* 61 B.R. 97 (Bankr.N.D.1986) (citing *In re Southern Communities, Inc.,* 57 B.R. 215 (Bankr.M.D.Fla.1986)). That is, it is bad faith to use bankruptcy law as a shield when to do so would be futile.

■ No matter which list of factors, or narrative indicia, any particular court may apply to determine good faith, in reaching its conclusion the "totality of circumstances" test must applied. The question to be raised is: Whether or not, under all the circumstances of the case, there has been an abuse of the provisions, purpose or spirit of the Bankruptcy Code? *See In re Smith,* 848 F.2d 813, 818 (7th Cir.1984) (citing *In re Rimgale,* 669 F.2d 426 (7th Cir.1982) and *In re Terry,* 630 F.2d 634, 635 (8th Cir.1980)); *In re Goeb,* 675 F.2d 1386, 1391 (9th Cir.1982); *In re Metz,* 820 F.2d 1495 (9th Cir.1987).

This court is aware that it has faulted Debtor in the previous section for failing to distinguish between good faith at the *filing* and in proposing a *plan,* and then itself cites cases in this section regarding indicia of bad faith with respect to the proposing and confirming of a Chapter 13 plan when the issue of the case is debtor's motive at filing. The answer to that seeming paradox is that the indicia of bad faith applicable to dismissal may be the same as the indicia of bad faith applicable to confirmation of debtor's Chapter 13 plan. *In re Hundley,* 99 B.R. 306, 308 (Bankr.E.D.Va. 1989); *see also In re McElveen,* 78 B.R. 1005 (Bankr.D.S.D.1987); *Matter of Mountcastle,* 68 B.R. 305 (Bankr.M.D.Fla. 1986); *In re Beauty,* 42 B.R. 655 (E.D.La. 1984). This court concludes that while the "indicia" may be the same, the critical factors for our inquiry are the point in time of the questioned acts and motives and the public policy interests to be protected. With these in mind, the use of the same or similar indicia are appropriate and not incompatible.

■ Finally, in determining debtor's lack of good faith, the court must attempt to draw an inference as to debtor's motive from the effect achieved. This process has been described as follows:

"Much of the case law on good faith draws heavily upon the time-honored method of analyzing and establishing a nexus between cause and effect. Long a *modus habilis* not only in bankruptcy but in criminal and tort law and in virtually any legal inquiry where intent is the issue, this sort of *a posteriori* inquiry permits courts to work backward from effect to cause—to reason, that is, that if the probable effect of a reorganization plan is to treat unfairly of creditors, then the probable cause of the filing was bad

faith. The judicial exercise of discovering antecedent intent through a study of subsequent conduct in not unknown in this Court."

*In re Khan,* 34 B.R. 574, 575 (Bankr. W.D.Ky.1983) (debtor's petition dismissed for bad faith where debtor filed for the purpose of evading a legal duty to pay a lifetime support contract debtor-physician entered to avoid a personal injury lawsuit); *see also In re Setzer,* 47 B.R. 340 (E.D.N.Y. 1985) (debtor's petition dismissed for bad faith where debtor's bankruptcy was filed to secure a litigation advantage).

### 5. *Good faith and the "new debtor"*

Creditor Kimes argues that the transfer to Ms. Powers of a 20% interest in the Spitzer property, on the very day of the filing of Debtor's petition, and only one day prior to the foreclosure sale set to collect on a promissory note which was all due and payable by the Spitzers alone approximately 5 months prior to the transfer, constituted a bad faith filing. The only, and utterly obvious, reason for the filing was to stop the foreclosure on the Spitzer property, causing delay to Kimes' effort to realize on his security. Other indicia of Debtor's lack of good faith, argued Mr. Kimes, was her lack of significant general unsecured debt and her failure to make complete disclosure regarding her debts.

The pattern of the transfer of distressed real property to a prospective "new debtor" on the eve of foreclosure is not a new scenario to bankruptcy proceedings. Most reported cases, however, unlike our case, deal with Chapter 11 debtors, and usually the transferee is a previously dormant corporation or a newly created entity. These circumstances differ from our case where we have a Chapter 13 debtor proposing a simpler plan to reorganize personal finances—but the purpose of the filing, and the resultant abuse, is the same.

One of the earliest cases involving the transfer of real property assets to a new debtor corporation for the purpose of filing a bankruptcy petition is *In re Dutch Flat Investment Co.,* 6 B.R. 470 (Bankr. N.D.Cal.1980). In that matter two new corporations were formed on May 22, 1980,

and each entity filed a Chapter 11 bankruptcy petition on May 27, 1980. There was only one creditor in each case; the creditor held notes secured by deeds of trust in property in which debtors likewise held an interest, and in which debtors' predecessors held title; the notes were due in April 1980, prior to the transfer and prior to the bankruptcy. Debtors' assets consisted of promissory notes secured by deeds of trust in the same property pledged to secure the creditors' notes. Debtors had one unsecured debt of $600 to their accountant.

The court found that debtors were organized for the sole purpose of filing bankruptcy to forestall the secured creditor's right to foreclose. And further, the court concluded that:

> "[B]oth cases should be dismissed to prevent further misuse of the Chapter 11 remedy by debtors which are not bona fide business organizations filing for the purpose of accomplishing rehabilitation and reorganization of viable ongoing businesses, particularly where debtors have elected not to submit the actual entities in interest to the jurisdiction of the court thereby isolating the entities in interest from scrutiny and control of the court during proceedings."

*Id.* at 471.

Another important, early, and often cited, case describing the "new debtor syndrome" is *In re Victory Construction Co., Inc.,* 9 B.R. 549 (Bankr.C.D.Cal.1981). The *Victory* decision contains an historical description of facts too detailed to report here, but in essence, debtor, an earlier formed corporate shell, was reactivated by its principal to purchase a parcel of highly encumbered real property. Debtor, having no funds of its own upon reactivation, was required to borrow funds from its principal in order to make its purchase. No note was prepared to evidence the loan, and no arrangements were made with respect to repayment of the loan.

Additionally, immediately prior to the acquisition, debtor was dormant, had no employees, was without assets and engaged in

no business activities. At the time debtor acquired the property its value was between $2.76 and $3.3 million, the encumbrances were about $2.9 million, and approximately $15,000 per month was required to service the debt to lienholders. The monthly income from the property was approximately $2,000. Ultimately, plans were made to develop the property as a hotel, but the property would have to be rezoned for that purpose. In due course, lenders set August 12, 1980, as the date of the foreclosure sale; on August 11, 1980, debtor's Chapter 11 bankruptcy petition was filed.

From these, and other, circumstances, the court in *Victory* concluded that:

> "The debtor is attempting to use the provisions of Chapter 11 to create and organize a new business, not to reorganize or rehabilitate an existing enterprise, or to preserve the going concern values of a viable or existing business."

> "The debtor knowingly and with full awareness of the economic risks embarked on a speculative real estate promotion...."

> "This is not a proceeding within the contemplation, intent, or purpose of Chapter 11 of the Code".

> "The debtor has acted with the intent to take advantage of the secured creditors' exposure to delay, loss, expense ... and has not acted with that candor, frankness, sincerity and willingness to do equity which are the indicia of 'good faith.'"

> "The purchase of a quitclaim to fully encumbered property on the eve of foreclosure, with the intent to use Chapter 11 to delay the secured creditors in enforcement of their rights, is inconsistent with the purpose, spirit, and intent of the statute, under the facts and circumstances here presented".

> "... [T]he preservation of this speculative venture should not be undertaken at the expense of secured creditors."

> "The debtor has purchased its way into [bankruptcy] court. Justice, equity and public policy prohibit this".

> "The petition was not filed with a genuine intent and desire to use the provisions of Chapter 11 for its intended purpose, but solely to prevent foreclosure while the debtor created a vehicle for profit.... That is a misuse of the reorganization process. The Code is not to be abused by the extension of its rights and privileges to those not within its contemplation."

*Id.* at 565.

In *In re Yukon Enterprises, Inc.*, 39 B.R. 919 (Bankr.C.D.Cal.1984), three units of a distressed condominium project were transferred to a newly created corporation—incorporated only two weeks prior—only two days prior the transferee corporation's filing of a Chapter 11 petition in bankruptcy. The mortgagee had received no payment for about 8 months. Debtor's schedules listed only one asset—the project units; its only unsecured creditor was bankruptcy counsel. The principal transferror testified that the transfer was made to protect the equity in the property.

The mortgagee in *Yukon* brought a motion for relief from stay on allegations that the filing lacked good faith. In making its determination, the court first held that where the creditor has established that the transfer of distressed property to the debtor occurred "in close proximity" to the filing a prima facie case has been made which creates a rebuttable presumption of bad faith [in *Yukon*, two days was sufficient "close proximity"]. Thereafter, said the court, the burden falls to the debtor to show "good and sufficient reasons" why relief should not be granted. Finally, the court continued, if the creditor proves that its substantive or procedural rights have been adversely affected by the transfer, "cause" is shown for bad faith relief under § 362(d)(1). To overcome these presumptions, the debtor, according to *Yukon*, must establish that reorganization is more likely after the transfer than debtor's possible reorganization without the transfer.

"The transfer of one's assets to a new debtor on the eve of a Chapter 11 filing may evidence an improper state of mind and such transfers will be scrutinized with

great care." *In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir. BAP 1983) (citing *In re Levinsky,* 23 B.R. 210, 218 (Bankr. E.D.N.Y.1982)); *In re Beach Club,* 22 B.R. 597, 599 (Bankr.N.D.Cal.1982). In *Thirtieth Place,* a newly created corporation filed bankruptcy soon after the receipt of distressed real property. The Appellate Panel found that the transfer of the property to new debtor was necessary both for its creation and for the filing of its petition, and in addition, the filing was done for the purpose of preventing foreclosure on the heavily encumbered property. The court further said:

"It must be noted that there was no plan contemplated for infusion of capital, no gain in managerial expertise, no history of past business conduct, no employees and indeed no current business activity ... nor are there any reasonable prospects for the conduct of future business. In short the debtor was created for the sole purpose of obtaining protection under the automatic stay by filing bankruptcy."

"It is evident from this case, that the purpose of creating the corporation and filing the bankruptcy was to delay the secured creditor. While any delay is harmful, when a proceeding is filed solely for the purpose of delay, the resulting injury approaches one which, when coupled with other factors should result in a dismissal."

"Where the petition is filed to subvert the legitimate rights of creditors in the absence of any reasonable expectations that the debtor can successfully reorganize, there is no basis for access to Chapter 11 and the protective machinery of the automatic stay."

*Thirtieth Place,* 30 B.R. at 506.

And finally, in a similar case, *In re American Property Corporation,* 44 B.R. 180 (Bankr.M.D.Fla.1984), title was taken to undeveloped real property by a previously dormant corporation on October 13, 1983. At the time of the purchase debtor knew that the property was subject to foreclosure by the lienholder. Between the time the property was acquired and the filing of the bankruptcy petition in July 1984, the debtor attempted to have it rezoned, but these efforts were unsuccessful. At the time of the filing, the undeveloped property was the principal asset of the debtor. Debtor, said the court, "does not conduct any business in the orthodox sense other than speculating in real estate." *Id.* at 182. In concluding that this case was filed without good faith, Chief Judge Paskay, declared that:

"Clearly, bad faith is shown if the purpose of a Chapter 11 debtor is to hold a single asset 'hostage' in order to speculate that such asset may increase in value in order to recover its original investment at the creditor's risk. Thus, courts have looked to whether the debtor names any unsecured creditors ...; whether the debtor has any assets to protect; and whether the debtor is engaged in an ongoing business, or whether the debtor is attempting to embark on a speculative real estate venture."

*Id.* at 182 (citations omitted).

### 6. *Burden of proof RE: lack of good faith*

While the Bankruptcy Code is silent regarding the burden of proof as to dismissals, courts have consistently held that once a debtor's good faith is in issue, the debtor bears the burden of proving the petition was filed in good faith. *In re Bingham,* 68 B.R. 933 (Bankr.M.D.Pa.1987) (citing *In re Setzer,* 47 B.R. 340 (Bankr. E.D.N.Y.1985)); *In re Holi–Penn, Inc.,* 535 F.2d 841, 844 (3d Cir.1976). Further, some courts have held that to show good faith and changed circumstances in serial or successive filing matters, the burden is on the debtor to prove with "detailed testimony" and "convincing evidence" his entitlement to the relief sought. *In re Pryor,* 54 B.R. 679, 681 (Bankr.D.S.C.1985) (quoting *In re Capitol–York Construction Corp.,* 43 B.R. 52 (Bankr.S.D.N.Y.1984)); *see also In re White,* 72 B.R. 169 (Bankr.D.S.C.1986); *In re McElveen,* 78 B.R. 1005, 1007 (Bankr. D.S.C.1987).

With respect to the burden of proof in establishing debtor's good faith in Chapter 11 proceedings, and more particularly "new

debtor syndrome" cases, numerous courts have followed the holding of *In re Yukon Enterprises, Inc.*, 39 B.R. 919, 921 (Bankr. C.D.Cal.1984), that "once the creditor establishes that the transfer of the distressed property to the debtor was in close proximity to the filing of the case, a prima facie showing of bad faith has been shown, thus creating a rebuttable presumption of bad faith." Where a prima facie showing has been made the burden is thereafter on the debtor to establish good and sufficient reasons why relief should not be granted. *See also In re Rye*, 54 B.R. 180, 182 (Bankr. D.S.C.1985); *In re Nelson*, 66 B.R. 231, 234 (Bankr.D.N.J.1986).

### 7. *Relief from stay*

11 U.S.C. § 362(d)(1) provides that

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause. . . .

■ It is well settled throughout the circuits, including the Ninth, that "cause" for relief from stay under § 362(d)(1) may include a finding by the Court that debtor's petition was filed in bad faith. *See In re Arnold*, 806 F.2d 937, 939 (9th Cir.1986); *In re Kemble*, 776 F.2d 802, 807 (9th Cir. 1985); *Matter of Littlecreek Development Co.*, 779 F.2d 1068 (5th Cir.1986); *In re Loeb Apartments, Inc.*, 89 F.2d 461 (7th Cir.1937); *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir.1984); *In re Natural Land Corp.*, 825 F.2d 296 (11th Cir. 1987); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988); *In re Yukon Enterprises, Inc.*, 39 B.R. 919, 921 (Bankr. C.D.Cal.1984); *In re Victory Construction Co.*, 9 B.R. 549 (Bankr.C.D.Cal.1981).

■ However, with respect to a confirmed Chapter 13 case, "Once the plan has been confirmed the only cause for relief from stay that may be validly asserted is the debtor's material failure to comply with the plan." 5 *Collier on Bankruptcy* ¶ 1307.01 at 1327–3 (15th ed. 1990) (citing *In re Ellis*, 60 B.R. 432 (9th Cir. BAP

1985)). Therefore, Kimes' motion for relief from stay must be denied.

### 8. *Rule 9011 sanctions and "bad faith"*

■ Bankruptcy Rule 9011, 11 U.S.C. Rule 9011, provides, among other things, that the signature of an attorney or party to a petition, pleading or motion constitutes a certificate that to the best of such attorney or party's knowledge, information or belief, "formed after reasonable inquiry," that such document is "well grounded in fact and is warranted by existing law . . .; and that it is not interposed for an improper purpose, such as to harass, to cause delay, or to increase the cost of litigation." Where the Court determines that such document is signed in violation of Rule 9011, it *"shall* impose upon the person who signed it, the represented party, or both, an appropriate sanction . . . including reasonable attorney's fees." The rule in the Ninth Circuit requires that "A bankruptcy court must impose sanctions when it finds a violation of Bankruptcy Rule 9011". *In re Webre*, 88 B.R. 242, 245 (9th Cir. BAP 1988) (citing *In re Lewis*, 79 B.R. 893, 896 (9th Cir. BAP 1987)).

■ As set forth in *In re Eighty South Lake, Inc.*, 63 B.R. 501 (Bankr. C.D.Cal.1986), *aff'd*, 81 B.R. 580 (9th Cir. BAP 1986), the responsibility for the filing of a bad faith petition must be jointly borne by both the debtor and its attorney. In making a determination whether sanctions are appropriate, the focus must be whether debtor and counsel first made "reasonable inquiry" that the filing, or the issue raised by the filing, was "well grounded in fact" and "warranted by existing law or a good faith argument for the extension, modification or reversal of existing law," and that the filing was not "interposed for any improper purpose such as to harass, to cause delay, or to increase the cost of litigation." *Id.* at 507.

■ An objective standard is to be used to determine whether a party or its attorney has acted with an improper purpose. *In re McKissie*, 103 B.R. 189, 194 (Bankr.N.D.Ill.1989) (citing *Thornton v. Wahl*, 787 F.2d 1151 (7th Cir.1986), *cert.*

*denied,* 479 U.S. 851, 107 S.Ct. 181, 93 L.Ed.2d 116 (1986)). But, Rule 9011 should not be used to "chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." *In re Villa Madrid,* 110 B.R. 919 (9th Cir. BAP 1990) (citing *In re Lewis,* 79 B.R. 893, 896 (9th Cir. BAP 1987)) (other citations omitted). The relevant inquiry with respect to sanctions where lack of good faith at the filing is in issue is "not whether the ... bankruptcy petition was filed in bad faith, but rather whether the [debtor] knew, or after reasonably diligent inquiry should have known, that the filing of the petition would be in bad faith." *Villa Madrid,* 110 B.R. at 922.

## ANALYSIS

 Prior to the hearing in these matters, the court reviewed Debtor's Chapter 13 case file, including her Chapter 13 Statement, along with the declarations filed by Ms. Powers in support of her opposition. Several questions with respect to omissions in Debtor's Statement, raised by Movant Kimes, were also curious questions to the court.

The first observation with respect to Ms. Powers' declaration in opposition to the motion to dismiss is that it is utterly devoid of any "hard" facts. Her declaration is much more remarkable for what it leaves unsaid than for what it states. She gives no facts whatsoever regarding her relationship with the Spitzers, or their son, except that she had been working with them "in an attempt to arrange refinancing." Initially, the declaration led the court to believe the Debtor was involved in the business of banking or finance—but that doesn't seem to be true—she says she is employed at a tire store. Then, without any real explanation, she says that she tried to borrow money from her mother-in-law. This is puzzling for two reasons. First, why did Powers become involved in Spitzers' efforts to "refinance" if in fact she had no money; and second, since her Statement mentions no husband, but does mention a "boyfriend"—who is this "mother-in-law"?

Thereafter, Ms. Powers states, "We discussed that I would buy a percentage interest in the property"—but the context of the statement is not clear—did she mean that she discussed this with the Spitzers or with her mother-in-law? Then later she states that neither her mother-in-law nor "a friend" could lend her the money. Finally, she says, "I was able to borrow $10,000 from another friend which I used, along with a note ..., to buy a 20% interest in the property." (Declaration of Patricia Jean Powers, Page 2[9], lines 5–6). There are no names, dates or places stated in her declaration with regard to any of these claimed acts and circumstances. Not even the ultimate lender of the $10,000 is named, nor is there attached to her declaration copies of any documents with respect to such transactions: no note payable by Ms. Powers to the lender for the $10,000 loan; and no note payable to the Spitzers for the balance due on the purchase of her 20% interest.

More significantly, Powers' Chapter 13 Statement fails to list as an obligation the $10,000 she borrowed prior to her filing. Additionally, her budget fails to make any provision for payments to (1) the Spitzers, (2) the lender of the $10,000, (3) Mr. Kimes, and (4) Kacor Development (holder of the first deed of trust). Under the budget category of expenses re: real property, she listed only a $700 per month expense for her "residence," and no amounts are listed for obligations to be paid on "other real property."

It is also curious to the court that while she stated under penalty of perjury in her declaration that she borrowed $10,000, she has very little by way of assets and income—$3,500 worth of household goods and personal effects (generally considered valueless as collateral), and earned net income of $720 per month, with monthly expenses of nearly twice her earned income. At the time she filed she had no automobile, no cash on hand, no deposits in any financial institution—she had no other asset except a "cause for action for personal injury" which has an "unknown" value (curiously she listed no medical debts). Why would anyone lend her $10,000? What is

more, there is no credible evidence that anyone did.

There is yet another curiosity. Mrs. Spitzer testified in her declaration that she and her husband agreed to sell a 20% interest in the Temecula land to Powers for $36,000, yet Powers testified that to make the purchase she borrowed $10,000 and signed a note to the Spitzers in the sum of $21,138—that doesn't add up to $36,000. Finally, the grant deed by which Spitzers transferred the 20% interest from themselves to Ms. Powers shows that *no* documentary transfer tax was paid to the County Recorder's Office. This generally indicates that the grantor has received *no consideration* for the transfer.

These questions, and the paucity of factual and documentary evidence presented by the Debtor, compel the court to examine this filing with close scrutiny. And on doing so, I must conclude that given the serious questions arising from her Chapter 13 Statement, which are entirely unanswered by her declaration, the declaration testimony of Ms. Powers is simply not the least bit satisfying—that is, when one examines all the circumstances of the transaction and the filing, the court does not find Ms. Powers' testimony credible in any respect.

Next, we examine the Spitzers' story. Mrs. Spitzer admitted that prior to the transfer to Ms. Powers (1) the Kimes note was due and payable, (2) she had been unable to get any firm commitment from Mr. Kimes to make other financial arrangements, (3) she was unable to obtain any conventional refinancing, (4) she received a Notice of Default from Kimes, and (5) a foreclosure sale was imminent at the time of the transfer. She thereafter stated unequivocally that "It finally turned out that we were not able to arrange other financing *in time to avoid foreclosure. Therefore,* we sold a 20% interest to [Powers] for a principal reduction payment of $10,000 and a note on the property for another $21,000." Indeed, the sale was set one day after the bankruptcy petition was filed.

It is without question that the Spitzers transferred an interest to Powers to "avoid foreclosure"—Mrs. Spitzer admits this. But, without the bankruptcy filing, the property could not be saved by the described transfer to Powers. The note was all due and payable—a sum of $45,000. The selling of an interest to Powers for only $31,000—only $10,000 of which appears to have been cash—could not save the property from Kimes' foreclosure. For that, the Spitzers needed $45,000, which they either didn't have or were unwilling to deliver. The $10,000 "principal reduction" Ms. Spitzer described could not by itself save the property from foreclosure; the Kimes note was all due—a partial payment of $10,000 would not stop the foreclosure. So, a bankruptcy petition was filed—but not by the Spitzers, who might have had a right to reorganize their pre-petition finances through a bankruptcy proceeding—but by Ms. Powers.

Under *Dutch Flat,* one of the badges of bad faith is debtor's recent receipt of distressed property and bankruptcy filing by *the transferee* "where the debtors have elected not to submit the actual [transferor] entities in interest to the jurisdiction of the court thereby isolating the entities in interest from scrutiny and control of the court...." 6 B.R. at 471. Why didn't the Spitzers file bankruptcy to save their own property? Neither the Spitzers nor the Debtor have given any reason—and, the burden is on Ms. Powers to present to the court facts sufficient to show there was some good faith reason for the transactions.

At this point, we may also examine Ms. Powers' pre-filing estate, and determine whether the transfer made it more or less likely that she could reorganize. From Debtor's Statement and the admissions in her declaration in opposition to the motion to dismiss, we know that two days prior to her bankruptcy filing (i.e. before she received the 20% interest in the Temecula land), Ms. Power's net worth was a *negative $1,500.* That figure is generous since her only assets consisted of household goods and personal effects, valued at $3,500, which generally have little liquidation value, against a "$5,000" obligation

due to the IRS and California Franchise Tax Board for income taxes due from 1984. The tax obligations must be viewed as "hard" dollar debt against "soft" asset values. [The court further notes that the exact figure of "$5,000" due to two different entities is suspect].

We also know that Debtor could not support herself on her earned income; the only way she has any disposable income is because she is given $1,150 per month "from Boyfriend." When that money is added to her earned income, she has disposable income of $424 per month. There is no information provided as to whether "Boyfriend" is contractually obligated to contribute these funds, or whether this gift is in any way tied to the transfer of the property. But, $424 per month is not a sufficient sum to pay her listed obligations because she failed to provide in her budget for payment on the Spitzer note, repayment of the $10,000 loan and the monthly payments on the Kimes and Kacor obligations. "Buying" a 20% interest in the Temecula land may have in some speculative way increased Ms. Powers' financial bottom line, but since it is raw land, and produces no income, the receipt of the property and the obligations attendant thereto actually only increased her monthly expense without increasing her monthly income. So, by taking the property, she was not necessarily made more likely to successfully reorganize. If there was evidence that the property were to sell immediately, and the escrow to close immediately, or if the property were to be refinanced immediately, her prospects for reorganizing might be improved, but we have no evidence whatsoever of this. [And, I believe, one would still be entitled to question Debtor's lack of good faith for filing].

Last, without the filing of a bankruptcy to "buy time", Ms. Powers' purchase of her interest made no economic sense whatsoever. *But for the filing of the bankruptcy,* or the intervention of some miracle, the day after her grant deed was recorded, and after she paid $10,000 to the Spitzers and became obligated to them for an additional $21,000 on a note, her interest in the property, along with that of the Spitzers, would have been totally "wiped out" by Kimes' foreclosure. The stay under § 362(a) stopped the foreclosure and saved Ms. Powers' investment from immediate failure. The logical conclusion, given Powers' financial circumstances, is that successful reorganization through Chapter 13 was more unlikely following the transfer than it was without the transfer.

Ultimately, however, the "alleged" transaction being presented to us without any documentary support whatsoever, simply stinks. Either it is a total sham transaction, i.e. it never really happened, which is likely because the only document we have with respect to the transaction, the recorded grant deed, shows no documentary transfer tax was paid,—Or, it is an attempt to shield a speculative undeveloped real estate venture by resorting to the bankruptcy court and using the automatic stay as a sword against Mr. Kimes' attempt to realize on his security. This is clearly proscribed under every bad faith case cited, and more particularly it fits squarely within the abuses described in *Dutch Flat, Victory Construction, Yukon Enterprises,* and *American Property Corporation.* Any one of the quoted passages from those cases could be used to describe this case, except that neither is Ms. Powers a newly created entity nor did she file a Chapter 11 case [though she might be called a "new debtor" because she is a new debtor to this property]—but the misuse of the Bankruptcy Code is the same, and is just as odious, and on that basis I conclude that the "new debtor syndrome" cases, and their lists of badges and principles, are applicable to this Chapter 13 matter.

Additionally, in the event other courts would disagree that the "new debtor" cases are applicable, Powers' filing is an abuse under *Newsome* (filing made to rid debtor of a burdensome contractual obligation), and *Waldron* (filing to enhance one's own financial coffers, or for a greedy and unworthy purpose).

Finally, I find that sanctions in this case are mandatory against both the debtor and her counsel. Under *Villa Madrid* the

focus of a Rule 9011 inquiry is not on whether the case was filed in bad faith, but whether, prior to the filing, debtor and her counsel made reasonable inquiries which would lead them to believe that the filing was warranted by existing law or a good faith argument for the extension, modification or reversal of existing law. And whether or not counsel subjectively believed he or she could make such an argument, the test is whether, objectively, such belief was reasonable. Debtor and her attorneys have totally failed to present *any* evidence of a reasonable inquiry made *before* the filing with respect to Debtor's good faith in filing, and even now they have wholly failed to cite any authority to justify a belief that the filing was proper.

Debtor's counsel did make a very weak oral argument to the effect that the transfer was not made "in close proximity" to the filing based upon the alleged "discussions" and "agreement in principle" in October 1990 that Debtor might buy a percentage of the property interest. But Debtor produced no evidence of any real agreement. There was no evidence that Ms. Powers had a contractual duty to buy the interest, and no evidence that she would suffer any penalty or incur any obligation if she did not purchase the interest from the Spitzers.

Mr. Kimes is entitled to recover from Debtor and her counsel, jointly and severally, a sum sufficient to reimburse to him *all* his reasonable attorney's fees and costs incurred with respect to this bankruptcy filing *from the date of its commencement.* Kimes and his counsel shall prepare declarations with respect to their total fees and costs incurred in this proceeding and lodge it with the court, along with a proposed form of order. In the event no objection to the fees and services is received within ten (10) days of the lodgment, the order will be signed and entered as the Court deems reasonable.

### CONCLUSION

Debtor has wholly failed to bear her burden to show her petition was filed in good faith and for a proper purpose. On the contrary, all the evidence points to one inescapable conclusion: Debtor's petition was filed to achieve an improper purpose. That is, she filed only to obtain the advantage of the automatic stay for the purposing of stopping Mr. Kimes' foreclosure on the Spitzers' property so that she could, for a greedy and improper motive, enhance her own financial coffers. She filed a bankruptcy to "buy time" to improperly shield her own recent "investment" in a speculative real estate venture. Such a filing lacks good faith, and therefore the motion for dismissal is granted. Sanctions, under these circumstances, are mandatory and are awarded jointly and severally against Debtor and her counsel. The motion for relief from stay is moot, but is also denied on other grounds.

This memorandum of opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure. A separate order shall issue.