**In re Silvia Elizabeth MITCHELL, Debtor.**

**No. LA 06–11892 ER.**

United States Bankruptcy Court, C.D. California, Los Angeles Division.

Dec. 5, 2006.

Hale Antico, Santa Clarita, CA, for Debtor.

MEMORANDUM OF DECISION GRANTING THE UNITED STATES TRUSTEE'S MOTION TO DISMISS CHAPTER 7 CASE WITH PREJUDICE PURSUANT TO 11 U.S.C. § 707(b)(3)(A)

ERNEST M. ROBLES, Bankruptcy Judge.

The United States Trustee ("UST") filed a Motion to Dismiss Chapter 7 Case with Prejudice Pursuant to 11 U.S.C. § 707(b)(3)(A) and Contingent Motion to Extend Bar Date for Filing Complaint under 11 U.S.C. § 727 Objecting to Debtor's Discharge ("Motion"). In the Motion, the UST argues that the Chapter 7 case filed by Debtor Silvia Elizabeth Mitchell ("Debtor") should be dismissed because: "Debtor filed her bankruptcy petition in bad faith, having willfully and intentionally engaged in abusive and fraudulent credit usage leading up to her bankruptcy filing." The Debtor opposed the Motion and raised several evidentiary objections. A hearing was held on October 19, 2006. The UST and the Debtor both entered appearances on the record. At the conclusion of the hearing, the Court took the UST's Motion and the Debtor's evidentiary objections under submission.

## I. Jurisdiction

■ This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(a)(2006) ("[T]he district courts shall have original and exclusive jurisdiction of all cases under title 11."), 28 U.S.C. § 157(a) ("Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."), General Order No. 266 of the United States District Court for the Central District of California (referring "all cases under Title 11 and all proceedings under Title 11 or arising in or related to a case under Title 11" to the district's bankruptcy judges), and 28 U.S.C. § 157(b) ("Bankruptcy judges may hear and determine ... all core proceedings...."). The UST's Motion to dismiss is a core proceeding because it was brought under 11 U.S.C. § 707(b), which governs abuse of the provisions of Chapter 7 of the Bankruptcy Code. *See City of Moreno Valley v. Century–TCI Cal., L.P.,* No. EDCV 02–1387–VAP (SGLx), 2003 WL 22126450, at *2, 2003 U.S. Dist. LEXIS 4490, at *6 (C.D.Cal. March 21, 2003) ("Core proceedings are those that: (1) involve a cause of action created or determined by a statutory provision of title 11 [the Bankruptcy Code]; or (2) are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.")

## II. Statement of Facts and Procedural History

The Debtor filed a voluntary Chapter 7 petition on May 8, 2006. The original meeting of creditors under 11 U.S.C. § 341(a) was held on June 13, 2006 and a continued 341(a) meeting was held on July

27, 2006. The Debtor attended both meetings.

On August 11, 2006, the UST filed the Motion currently before the Court arguing that the Debtor's case should be dismissed under § 707(b)(3)(A) as having been commenced in bad faith.[1] Specifically, the UST contends that "given her long-standing lack of income, the Debtor's credit transactions in the months leading up to her bankruptcy filing, both before and after consulting bankruptcy counsel, were abusive and made in anticipation of filing the instant bankruptcy case." The UST has submitted the following evidence in support of its allegations: (1) the Debtor has $62,521.00 in non-priority unsecured debt, which she has identified as being as primarily consumer in nature (as opposed to debt incurred for business purposes); (2) the Debtor stated under oath during her initial 341(a) meeting that she has been unemployed since 2004 and that she is not currently experiencing any medical condition that would prevent her from working; (3) the Debtor was unemployed throughout the year 2003; (4) in the past four years, the Debtor has earned a grand total of $11,000, all of it during calendar year 2004; (5) the Debtor admits that she earned no income at all during 2003, 2005, and 2006; (6) the Debtor's Statement of Financial Affairs and bankruptcy schedules list no other sources of income; (7) according to the credit card statements submitted to the UST by the Debtor, she spent at least $15,386.32 during the year 2005 on products and services labeled by the UST as "non-essential" and organized into various categories including "dining out", "women's fashions and accessories"[2], "electronics and personal property"[3], and "beauty treatments and related products"[4]; (8) the Debtor contacted a bankruptcy attorney on December 1, 2005 when she tendered $100.00 to the Price Law Group, reportedly to retain that law firm to act as bankruptcy counsel for her roommate, Angel Dawn McGaugh; (9) the Debtor made an additional payment of $1,449.00 to the Price Law Group on February 28, 2006; (10) from January 2006 to April 2006 (the four months before she filed her bankruptcy petition), the Debtor spent $13,531.52 on "dining out", "pet pampering,"[5] "women's fashions and accessories"[6], "electronics and personal property", and "beauty

---

1. Unless otherwise indicated, all statutory citations refer to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

2. Even though she listed only $400 worth of clothing assets on Schedule B (which was filed with her petition), the Debtor's credit card statements reveal purchases of at least $7,698.56 during 2005 at a variety of clothiers including Barneys New York, Anthropologie, Lucky Brand Dungarees, Victoria's Secret, and Frederick's of Hollywood.

3. The Debtor spent at least $3,469.60 in 2005 on "electronics and personal property" at various retailers including Best Buy, Crate & Barrel, Far Corners Antiques, and Bed Bath & Beyond.

4. Between January 2005 and December 2005, the Debtor spent $2,985.32 on "Beauty Treat-

ments and Related Products" at various businesses including Chroma Makeup Studio, Colosseum Fitness Center, Studio Nail & Skin Care, Beverly Hills Health & Fitness, Brooks Massage Therapy, L Salon, and Turn Back Time, a "Cosmetic Medical Center" located in Santa Monica, California.

5. According to her January 2006 to April 2006 credit card statements, the Debtor spent at least $1,223.42 at establishments such as Doggie Styles, Melrose Pet Grooming, the Bark, LA Dogworks, Lucky Pup Designs, Barking Lot, Petlove, Collar & Leash, Petville, and Holistic Hound. The UST labels these expenditures "pet pampering."

6. In the first four months of 2006, the Debtor spent at least $5,250.56 on "women's fashions and accessories." This is in addition to the $7,698.56 she spent in 2005.

treatments and related products"[7]; (11) the Debtor's January 2006 to April 2006 spending amounts to a substantial increase from $1,282.19 average monthly spending on "nonessentials" during 2005 to $3007.00 per month in 2006; (12) the Debtor allowed at least $355.51 in charges on one credit card during March and April 2006 by Ms. McGaugh; (13) between January 4, 2006 and April 17, 2006, the Debtor took one credit card from a zero balance to a balance owing of $7,708.00; (14) with a different credit card, the Debtor went from a zero balance to owing $1,435.76 in just six days in April 2006; (15) over a 16–day period near the end of 2005, the Debtor incurred over $11,000 in purchases against one credit card account; and (16) in the seven months between July 2005 and February 2006, the Debtor opened at least five new credit card accounts and charged $39,473.00 against those accounts, which amounts to 63.2% of her total reported non-priority unsecured debt.

In addition, the UST notes that the Debtor received at least $21,092.59 in deposits to her bank account between March 2005 and April 2006 but failed to fully account for this income in her schedules and Statement of Financial Affairs as required by 11 U.S.C. § 521(a)(1). At least $16,654 of these funds was deposited in the six months leading up to her bankruptcy filing. Moreover, the UST claims that, "while the Debtor has been completely without earned income throughout 2005 and 2006 and has affirmed in writing that she has never taken any cash advances on any of her credit cards or transferred balances from card to card (a practice known as 'kiting') in the 12 months before filing the present bankruptcy case," three substantial electronic payments totaling $14,025.00 were made to reduce several of her credit card balances. Finally, the UST states that the Debtor created a false sense of financial solvency by lying to at least one creditor, American Express, in July 2005 and claiming that she was then employed by Straight Edge Productions and earning $80,000 per year. The UST argues that these deceptive acts by the Debtor should viewed as additional evidence of bad faith and of her abuse of the provisions of Chapter 7.

Alternatively, if the Court were inclined to deny the Motion, the UST requests that the bar date for filing a § 727 complaint to deny the Debtor's discharge be extended by at least 90 days from the date of the hearing on the Motion. The UST requests this additional time so that it may complete its "pending investigation, including formal discovery and a Rule 2004 examination, to obtain additional testimony, and/or other evidence produced by the Debtor or other parties in interest."

In her Opposition to U.S. Trustee's Motion to Dismiss Chapter 7 Case and Extend Bar Date ("Opposition"), the Debtor argues that the facts alleged by the UST "simply do not add up to bad faith or abuse" and that her inability to pay her debts is the result of "bad luck, not bad faith." The Debtor claims that she has an "earning capacity" "well in excess of $6,250 per month," which is evidence that "but for her unexpected inability to find work in her profession she would easily have been able to pay her consumer debts." The Debtor states that she is an FAA-certified pilot and that she has had two "informal interviews" since the Spring of 2005. One of these "informal interviews" was with a pilot at America West Airlines (which has since merged with U.S. Airways). According to the Debtor, a job there "would have paid well in excess of $100,000 after a

---

**7.** The Debtor spent $1,709.03 on "beauty treatments and related products" between January 2006 and April 2006 at many of the same outfits she frequented during 2005.

148

probationary period and a few years with the airline." The other "informal interview" was with the flight department at Hewlett Packard where, according to the Debtor, her salary would quickly "increase to over $100,000 per year." Neither of the Debtor's "informal interviews" resulted in an offer of employment. Regardless, based upon her training and experience, the Debtor believes that one day she will work as commercial airline pilot and earn between $160,000 and $230,000 per year. In light of this "earning capacity," the Debtor argues that she has the "ability to earn more than sufficient income to service her accumulated debt." The Debtor also contends that there is no evidence showing that her "proposed family budget is excessive or extravagant" but "to the contrary, her monthly expenses are less than $1000." [8]

In addition, the Debtor denies having any "discussions with any attorney at the Price Law Group regarding the bankruptcy process." The Debtor states that, at the time she paid the Price Law Group to represent Ms. Mcgaugh, she and Ms. Mcgaugh discussed "keeping [the Debtor's] credit clean" so that they "may attempt to purchase a home together once [the Debtor] was employed as a pilot."

Finally, the Debtor claims that her bankruptcy schedules correctly reflect her "assets, liabilities, and financial condition" and that her "statement of income and expenses is accurate." She states that, between November 2005 and April 2006, a friend deposited $16,500 into her bank accounts to help cover living expenses. The

Debtor states that her friend has not asked her to pay back this money, but rather she "has requested that [the Debtor] give back by donating [her] time to a charity of [her] choice." The Debtor also argues that "[t]he UST's assertion that [she] made 'three substantial electronic payments' [towards her credit card debt] is incorrect." The Debtor states, however, that she "did attempt to lower [her] interest rate by accepting lower interest offers from credit card companies" "with the full expectation of paying [her] creditors back as soon as [she] commenced working as a commercial pilot."

The Debtor also filed her Evidentiary Objections to Declarations of Wendy C. Sadovnick raising several objections to the Declaration of Bankruptcy Analyst, which was signed by Wendy Sadovnick and submitted as part of the Motion ("Sadovnick Declaration"), and the Supplemental Declaration of Bankruptcy Analyst Wendy Carole Sadovnick in Further Support of United States Trustee's Notice of Motion and Motion to Dismiss Chapter 7 Case Pursuant to 11 U.S.C. § 707(b)(3)(A) ("Supplemental Sadovnick Declaration").[9] Specifically, the Debtor argues that a certain statement in the Sadovnick Declaration, which indicates that the Debtor had charged nearly $11,351.25 over a 16–day period on mostly "non-essential items", was speculative and lacked foundation as "there is no factual basis set forth for the contention that declarant has knowledge of the Debtor's mind-set and intentions" or "that the charges referenced were for non-essential items and discretionary

8. Although the Debtor did not specify what her "proposed family budget" entails, it appears that she may have been referring to the expenses listed in Schedule J, which she filed with her bankruptcy petition. On Schedule J (Current Expenditures of Individual Debtor), the Debtor claims that her monthly expenses total $990.00.

9. According to her declarations, Ms. Sadovnick has been employed as a Bankruptcy Analyst by the Office of the United States Trustee for the Central District of California since 1985.

items." The Debtor raises these very same objections to various portions of the Sadovnick Declaration that claim that the Debtor used her credit cards during 2005 and 2006 to incur $28,917.84 in mostly "extravagant" expenses. In addition, the Debtor objects to the paragraph in the Supplemental Sadovnick Declaration that states that the Debtor lied to American Express about being employed by Straight Edge Productions (and earning $80,000 per year) as being inadmissible hearsay, as being speculative, and as lacking foundation. Finally, the Debtor argues that other statements in the Supplemental Sadovnick Declaration, which indicate that certain of the Debtor's credit card expenditures were "discretionary in nature" and included the purchase of "non-essential items," lack foundation and are speculative in that "there is no factual basis set forth for the contention that the declarant has knowledge of the Debtor's mind-set and intentions" or "that the charges referenced were for non-essential items and discretionary items."

The UST filed a Reply to Debtor's Evidentiary Objections to Declarations of Wendy C. Sadovnick ("Reply to Evidentiary Objections") arguing that each of the Debtor's objections should be overruled. As to the objections claiming lack of foundation and speculation, the UST argues that the relevant statements are the opinions of a lay witness, which are adequately supported by the various Exhibits attached to the Motion. The UST also asserts that the Court should overrule the Debtor's hearsay objections because the relevant statements by Ms. Sadovnick "only reiterate" the Debtor's own comments as recorded in the American Express records attached to the Supplemental Sadovnick Declaration as Exhibit "B".

The UST also filed a Reply to Debtor's Opposition to U.S. Trustee's Motion to Dismiss Chapter 7 Case and Extend Bar Date ("Reply to Opposition") emphasizing that its Motion to dismiss is based on § 707(b)(3)(A) ("bad faith") not § 707(b)(3)(B) (the "totality of the circumstances ... of the debtor's financial situation"). The UST also disputes the validity of the Debtor's arguments concerning her "earning potential". It notes that during her last job (in 2004) she earned only $11,000 per year. The UST further explains that the Debtor stated under oath during her first § 341(a) meeting that, in the immediate future, she would likely take a similar low-paying job. In addition, the UST argues that the Debtor, at a time when she was unemployed and had no certain prospects of future employment, used her credit cards to support an "extravagant" lifestyle in complete disregard for her limited financial resources. According to the UST, the Debtor's "hopes of one day finding suitable employment do not mitigate the bad faith of the types of expenses she incurred in her straightened circumstances." Finally, the UST argues that the following actions by the Debtor provide circumstantial evidence of bad faith and of the Debtor's intent to defraud creditors: (1) using credit cards to "maintain a lifestyle she had never earned enough to support" for nearly a year and half after leaving her last job; (2) lying about her employment status and annual income in order to obtain credit; (3) failing to disclose a $16,500 "gift" in her schedules and Statement of Financial Affairs; and (4) dramatically increasing her credit card spending in the months leading up to her chapter 7 filing and after having contacted a bankruptcy attorney.

During the hearing on the Motion, the UST requested that, in addition to granting its Motion, the Court enter an order barring the Debtor from refiling another Chapter 7 petition for 180 days. The Debtor opposed the imposition of such a

bar, asserting that this case presents none of the indicia that would lead to a bar on refiling under § 109 of the Bankruptcy Code. In addition, the Debtor argued that while the facts in this case might seem to approach bad faith, they do not quite reach it because: (1) the Debtor took no cash advances against her credit cards; (2) she has not been gambling; (3) there have been no § 523 complaints; (4) there were no fraud complaints prior to the bankruptcy filing; and (5) there were no prior bankruptcy cases. Finally, the Debtor raised two other objections to the introduction of the Sadovnick declarations. First, she claimed that they constitute improper advocacy before a Court by a non-attorney. Second, she argued that Ms. Sadovnick is disqualified from serving as a witness in this case because she is employed by the UST.

For the reasons given *infra*, the Court finds that the each of the Debtor's evidentiary objections is without merit and that she filed her Chapter 7 petition in bad faith. Furthermore, the Court concludes that filing one Chapter 7 petition in bad faith is sufficient "cause" under 11 U.S.C. § 349 to impose a 180–day bar against refiling another Chapter 7 petition. Accordingly, the Court overrules the evidentiary objections, grants the Motion, dismisses the Debtor's case, and orders that she be barred from filing another Chapter 7 petition for 180 days.

## III. Discussion

In relevant part, § 707(b) of the Bankruptcy Code states:

"After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee ... or any party in interest, may dismiss a case filed by an individual debtor under [Chapter 7] whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7 of the Bankruptcy Code] ... In considering ... whether the granting of relief would be an abuse of the provisions of [Chapter 7] in a case in which the presumption [of abuse laid out in § 707(b)(2)(A)(I)] does not arise or is rebutted,[10] the court shall consider—(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse."

11 U.S.C. § 707(b)(1), (3). Section 707(b) was amended as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Among other things, the "substantial abuse" threshold for § 707(b) dismissals was replaced with a simple "abuse" standard. *See* 11 U.S.C. § 707(b)(1). In addition, BAPCPA added two tests to determine whether an "abuse" of Chapter 7 exists: (1) the filing of a petition in "bad faith" (11 U.S.C. § 707(b)(3)(A)); and whether "the totality of the circumstances ... of the

---

10. Pursuant to § 707(b)(2), a presumption of abuse of Chapter 7 arises in certain cases. See 11 U.S.C. § 707(b)(2)(A)(i)(I)-(II). However, when a debtor's income is below the applicable median family income, neither the court nor any party in interest may bring a motion claiming presumptive abuse. 11 U.S.C. § 707(b)(7)(i). In this case, the Debtor asserts (and there is no evidence to contradict) that she currently has no income, which is certainly below the relevant median family income. Therefore, pursuant to § 707(b)(7), no party may argue that the Debtor's case should be dismissed as being presumptively abusive under § 707(b)(2).

debtor's financial situation demonstrates abuse" (11 U.S.C. § 707(b)(3)(B)).

Section 707(b) applies to the Debtor's case because, as she has acknowledged in her petition, she is an individual debtor under Chapter 7 whose debts are primarily consumer in nature. Furthermore, only § 707(b)(3)(A) (dismissal based upon a debtor's bad faith filing of a Chapter 7 petition) is at issue in this case due to UST's explicit limitation of its request for relief to that Code section. Before addressing the merits of the UST's Motion, however, the Court must first resolve the Debtor's various evidentiary objections.

### A. The Debtor's Evidentiary Objections

As explained *supra*, the Debtor challenges the admissibility of various statements made in the Sadovnick Declarations. Each of these objections, however, is without merit.

 The Debtor's hearsay objection to statements concerning her falsification of an American Express credit application is hereby overruled for two reasons. First, a party's own statements, when offered against them as evidence, are not hearsay. *See* Fed.R.Evid. 801(d)(2)(A) ("A statement is not hearsay if ... the statement is offered against a party and is ... the party's own statement, in either an individual or a representative capacity."); *United States v. Arteaga*, 117 F.3d 388, 395 (9th Cir.1997) ("[A] party's own statement, if offered against that party, is not hearsay...."). Second, the American Express records containing the Debtor's false statements are admissible under the business records exception to the hearsay rule given that they are accompanied by a certification that: (1) they were "made at or near the time of the events reflected" in the documents; (2) they were "kept in good faith and [were] created in the normal course of business"; and (3) "it is the

regular course of business of American Express Travel Related Services Company, Inc. to make these records." *See* Fed. R.Evid. 803(6) ("A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation [are not excluded by the hearsay rule].").

 Likewise, the Court hereby overrules the Debtor's objections that various statements in the Sadovnick declarations are speculative and lack foundation in that "there is no factual basis set forth for the contention that [Ms. Sadovnick] has knowledge of the Debtor's mind-set and intentions" or "that the charges referenced were for non-essential items and discretionary items." Contrary to the Debtor's assertions, the Sadovnick declarations do not express opinions concerning the Debtor's state of mind and intentions. Rather, the declarations describe facts that the UST, in its Motion, uses to argue the Debtor filed her Chapter 7 petition in bad faith. Furthermore, while Ms. Sadovnick does describe some of the Debtor's purchases as "discretionary" and "non-essential", there is a sufficient foundation for these statements in the exhibits to the Motion and the Supplemental Sadovnick Declaration. For example, the Debtor's various credit card statements, which were submitted as to the Court as exhibits, show that the Debtor made substantial purchases at retailers such as "Doggie Styles", "Wilshire Beauty Supply", "Barking Lot" pet groomers, "L Salon", "Comcast Cable", "Purple Circle Salon", "Studio Nail and Skin", "Cowgirl Hall of Fame", "Chroma Makeup Studio", "Turn Back

Time" a cosmetic medical center, "Far Corners Antiques", and "Tiffany and Co." The Court is convinced that, in identifying the businesses where the Debtor incurred her credit card debt, Ms. Sadovnick has laid a sufficient foundation for her opinion that many of the Debtor's purchases were for "discretionary" or "non-essential" items. In fact, it is difficult to imagine that the Debtor could make any other type of purchase at Tiffany & Co. or the various beauty salons, make up studios, and dog groomers she visited.

■ Furthermore, the Court hereby overrules the Debtor's objections concerning improper advocacy by Ms. Sadovnick. As explained *supra*, the Sadovnick declarations do not explicitly argue that the Debtor filed her petition in bad faith. Rather, they set forth facts concerning the Debtor's use of her credit cards and express an adequately-supported opinion that some of the Debtor's purchases were "discretionary" and "non-essential". Reciting the history of the Debtor's credit card expenditures and opining that some of them were not necessary for survival is a far cry from asserting a legal argument that the Debtor filed her bankruptcy petition in bad faith.

■ Finally, the Court hereby overrules the Debtor's objection claiming that Ms. Sadovnick is disqualified from submitting a declaration in support of the Motion because she is employed by the UST. The Debtor argues that the Court should not consider the Sadovnick Declarations because, as an employee at the UST's office, she is disqualified from serving as a witness in any case in which the UST is involved. To support this argument, the Debtor likened Ms. Sadovnick's role to that of a secretary or paralegal of an attorney representing a party in a legal dispute. Because such a secretary or paralegal would not be allowed to serve as a witness,

the Debtor claims, Ms. Sadovnick should not be allowed to submit a declaration in support of the UST's Motion. The Court, however, does not find this analogy persuasive. As the Court understands the role of Bankruptcy Analysts at the UST's office, they do not act as support staff to an attorney in the same way that a secretary or paralegal does. Rather, they are more akin to an investigator hired by a party to look into the facts of a case. Because such investigators are clearly allowed to serve as witnesses (*see, e.g., United States v. Riley*, 1991 WL 24322, at *1, 1991 U.S. Dist. LEXIS 1882, at *2–3 (S.D.N.Y.1991)), the Court finds that Bankruptcy Analysts at the UST's office should also be allowed to act as witnesses.

### B. The UST's Request for Dismissal under § 707(b)(3)(A)

Having determined that it is supported by competent evidence, the Court now turns to the merits of the Motion. The UST argues that the Debtor's case should be dismissed because she filed her Chapter 7 petition in bad faith. The Debtor vigorously refutes this contention. However, for the reasons given *infra*, the Court finds that there is sufficient evidence of bad faith to warrant dismissal of the Debtor's case under § 707(b)(3)(A).

### i) Dismissal under § 707 after BAPCPA

Before the enactment of BAPCPA, the Bankruptcy Appellate Panel for the Ninth Circuit ("BAP") had determined that a case should not be dismissed under § 707 if relief from a debtor's bad acts was available under any other provision of the Bankruptcy Code. *See Padilla v. Frazer (In re Padilla)*, 214 B.R. 496, 500 (9th Cir. BAP 1997), aff'd *sub nom. Neary v. Padilla (In re Padilla)*, 222 F.3d 1184 (9th Cir.2000). In *Padilla*, the bankruptcy court found that a debtor filed his bank-

ruptcy petition in bad faith and dismissed his case because, *inter alia:* (1) over the course of a relatively short period of time, he incurred credit card debt nearly equal to his annual income; (2) he made transfers to insiders; and (3) he sold personal property to raise cash for gambling. *Id.* at 499. The BAP, however, reversed the dismissal, stating that relief for the particular types of bad conduct attributed to the debtor was available under 11 U.S.C. §§ 522, 523 and 727 and concluding that § 707(a) "should not be used as a substitute for these provisions." *Id.*

■ However, in light of the recent addition of § 707(b)(3)(A) to the Bankruptcy Code, the Court is now free to dismiss a case under § 707 even if the Bankruptcy Code provides another remedy for a debtor's "bad faith" acts. *See* 11 U.S.C. § 707(b)(3)(A). This is because § 707(b)(3)(A) specifically lists the filing a petition in "bad faith" as an example of "abuse" of the bankruptcy system warranting dismissal of a Chapter 7 case. *See id.*

### ii) Dismissal for "Abuse" Including the Filing of a Petition in "Bad Faith"

Under § 707(b)(3) courts must ascertain whether the granting of relief to a debtor would constitute an "abuse" of the provisions of Chapter 7. 11 U.S.C. § 707(b)(3). In making this determination, courts "shall consider ... whether the debtor filed the petition in bad faith [or] the totality of the circumstances ... of the debtor's financial situation demonstrates abuse." 11 U.S.C. §§ 707(b)(3)(A)–(B). The structure of these provisions indicates that the courts must ultimately determine whether there is "abuse" of Chapter 7. Such abuse might include, but is not necessarily limited to, the filing of a petition in "bad faith".

Prior to the enactment of BAPCPA, the Ninth Circuit formulated a test for identifying "substantial abuse" under the former version of § 707(b). *See Price v. United States Trustee (In re Price),* 353 F.3d 1135, 1139–1140 (9th Cir.2004). The *Price* test called for an examination of all relevant facts and circumstances in a case, including the following benchmarks: (1) whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims; (2) whether the debtor's petition was filed as a consequence of illness, disability, unemployment, or some other calamity; (3) whether the schedules suggest the debtor obtained cash advancements and consumer goods on credit exceeding his or her ability to repay them; (4) whether the debtor's proposed family budget is excessive or extravagant; (5) whether the debtor's statement of income and expenses is misrepresentative of the debtor's financial condition; and (6) whether the debtor has engaged in eve-of-bankruptcy purchases. *Id.* Given that BAPCPA has lowered the threshold for dismissal under § 707(b) from "substantial abuse" to "abuse", it appears that the *Price* test (which was formulated for the more rigorous "substantial abuse" standard) is still relevant in making determinations of "abuse" under the current version of § 707(b)(3).

In addition, § 707(b)(3)(A) requires a finding as to whether a Chapter 7 petition was filed in "bad faith". That term, however, is not defined in the Bankruptcy Code. In fact, the meaning of "bad faith" under § 707(b)(3)(A) appears to be a matter of first impression among the various courts in the Ninth Circuit.

■ In this Court's view, the standards for bad faith dismissal used in Chapter 11 and Chapter 13 cases should, to the extent

possible, also apply in Chapter 7 cases via § 707(b)(3)(A).[11] This is true for several reasons. First, the harm of filing a voluntary petition in bad faith is essentially the same no matter what chapter of the Bankruptcy Code a debtor chooses to file under—creditors will be unjustly deprived of their rights and the integrity of the bankruptcy system and of the courts will be weakened. Second, creating a variety of bad faith standards for the filing of bankruptcy petitions would be unnecessarily confusing and would only encourage potential bad-faith filers to choose the chapter of the Code that appears to have the most favorable bad faith test. Finally, as things currently stand, the bad faith tests in Chapter 11 and Chapter 13 are, at their core, basically the same. Each requires courts to evaluate all of the relevant facts and circumstances in a case to determine whether a debtor's intention in filing a bankruptcy petition is consistent with the purposes of the Bankruptcy Code. *Compare In re Powers*, 135 B.R. 980, 991–92 (Bankr.C.D.Cal.1991) (stating that a determination of bad faith in Chapter 13 cases "depends upon the facts and circumstances presented" and requires "examination into any abuses of the provisions, purpose, or spirit of bankruptcy law and into whether the debtor honestly needs the liberal protection of the Bankruptcy Code") *with In re Marshall*, 298 B.R. 670, 681 (Bankr. C.D.Cal.2003) (quoting *In re Arnold*, 806 F.2d 937, 939 (9th Cir.1986))(explaining that a finding of bad faith in Chapter 11 cases " 'depends upon an amalgam of factors and not upon a specific fact' " and that " '[g]ood faith is lacking only when the debtor's actions are a clear abuse of the

bankruptcy process' "). This Court sees no reason why "bad faith" in Chapter 7 should diverge from this standard.

▮ Courts applying the Chapter 11 and Chapter 13 bad faith tests generally consider a variety of non-exclusive factors, including: (1) the debtor's history of filings and dismissals (*Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224 (9th Cir. 1999)); (2) whether a debtor misrepresented facts in their petition, unfairly manipulated the Bankruptcy Code, or otherwise filed the petition in an inequitable manner (*Id.; Marshall*, 298 B.R. at 681); (3) whether the debtor is actually in need of bankruptcy protection (*Marshall*, 298 B.R. at 681); (4) whether the debtor intended to invoke the automatic stay for improper purposes, such as for the sole objective of defeating state court litigation (*Id.; Leavitt*, 171 F.3d at 1224); and (5) whether egregious behavior is present (*Leavitt*, 171 F.3d at 1224). However, neither malice nor fraudulent intent by the debtor is required for a finding of bad faith in Chapter 11 or Chapter 13 cases. *See id.* Furthermore, no single criterion should be considered dispositive, but rather the entirety of the situation must be evaluated. *See Powers*, 135 B.R. at 991–92; *Marshall*, 298 B.R. at 681.

▮ In sum, by borrowing from the Ninth Circuit's "substantial abuse" test and from the bad faith criteria applicable to Chapter 11 and Chapter 13 cases, this Court finds that the following legal standards apply when determining whether to dismiss a case under § 707(b)(3)(A). First, the Court must evaluate whether, in light of all the relevant facts and circum-

---

**11.** Before the enactment of BAPCPA, in *Neary v. Padilla (In re Padilla)*, the Ninth Circuit concluded that "bad faith as a general proposition does not provide 'cause' to dismiss a Chapter 7 petition under § 707(a)" because Chapter 7 did not specifically include a re-

quirement of "good faith" as do Chapters 11 and 13. *See* 222 F.3d at 1191–93. However, in light of the addition of § 707(b)(3) to the Bankruptcy Code, a debtor's bad faith now clearly constitutes grounds for dismissal of a Chapter 7 case.

stances, it appears that the debtor's intention in filing a bankruptcy petition is inconsistent with the Chapter 7 goals of providing a "fresh start" to debtors and maximizing the return to creditors.[12] *See Powers,* 135 B.R. at 991–92; *Marshall,* 298 B.R. at 681; *See also In re De La Rosa,* 91 B.R. 920, 922 (Bankr.S.D.Cal. 1988); *In re Diego,* 6 B.R. 468, 469 (Bankr.N.D.Cal.1980). In making this determination, the Court will consider the following factors: (1) whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims; (2) whether the debtor's petition was filed as a consequence of illness, disability, unemployment, or some other calamity; (3) whether the schedules suggest the debtor obtained cash advancements and consumer goods on credit exceeding his or her ability to repay them; (4) whether the debtor's proposed family budget is excessive or extravagant; (5) whether the debtor's statement of income and expenses is misrepresentative of the debtor's financial condition; (6) whether the debtor has engaged in eve-of-bankruptcy purchases; (7) whether the debtor has a history of bankruptcy petition filings and case dismissals; (8) whether the debtor intended to invoke the automatic stay for improper purposes, such as for the sole objective of defeating state court litigation; and (9) whether egregious behavior is present. *See Price,* 353 F.3d at 1139–1140; *Leavitt,* 171 F.3d at 1224; *Marshall,* 298 B.R. at 681. As in Chapter 11 and Chapter 13 cases, this Court finds that no single criterion should be considered dispositive, but rather all of the facts in a case must be evaluated. *See Powers,*

135 B.R. at 991–92; *Marshall,* 298 B.R. at 681. Finally, the Court also concludes that neither malice nor fraudulent intent by the debtor is required for a finding of bad faith under § 707(b)(3). *See Leavitt,* 171 F.3d at 1224.

■ Applying these standards to this case, the Court finds that granting relief to the Debtor would amount to an abuse of the provisions of Chapter 7 because the Debtor has filed her bankruptcy petition in bad faith. The Debtor stated under oath during her 341(a) meeting that she has been unemployed since 2004. During the time she was employed, she received a total of $11,000 in annual income. Regardless, as the UST has demonstrated, the Debtor spent a total of $15,386.32 on "dining out," "women's fashions and accessories," "electronics and personal property," and "beauty treatments and related products" during the year 2005. Moreover, in the first four months of 2006 (leading up to her bankruptcy filing in May 2006), the Debtor spent $13,531.52 on these same types of items. This amounts to an *increase* from $1,282.19 average monthly spending on non-essential consumer goods during 2005 to $3007.00 per month in the four months prior to the Debtor's bankruptcy filing in May 2006. This increase in spending occurred after the Debtor had contacted a bankruptcy attorney. Furthermore, the amounts of debt incurred throughout 2005 ($15,386.32) and during the first four months of 2006 ($13,531.52) far exceed the Debtor's last reported annual income. All of these facts indicate that the Debtor has obtained "consumer goods on credit exceeding ... [her] ability to repay them" and that she engaged in

---

**12.** While many of the cases describing the test for bad faith under Chapters 11 and 13 refer to the "totality of the circumstances". (*See, e.g., Marshall,* 298 B.R. at 681), this Court believes it is best to avoid such language when discussing § 707(b)(3)(A) in order to avoid confusion with § 707(b)(3)(B), which calls for an analysis of the "totality of the circumstances ... of the debtor's financial situation." See 11 U.S.C. § 707(b)(3)(A)-(B).

several weeks worth of "eve-of-bankruptcy purchases." *See Price,* 353 F.3d at 1139–1140.

Moreover, the Debtor has never claimed that there are mitigating circumstances surrounding her credit card spending or the filing of her Chapter 7 petition, such as illness, disability, or some other calamity. *See id.* While the Debtor does claim that her inability to service her debt is the result of her "unexpected inability to find work in her profession", the Court is not convinced that this indicates a lack of bad faith because the Court is simply not persuaded that the Debtor's current unemployment is "unexpected". According to the evidence presented, the Debtor is not currently experiencing any medical condition that would prevent her from working. Furthermore, according to the Debtor's own statements, she has only attended two "informal" job interviews since leaving her last job in 2004. In light of these scant efforts, it is not surprising that the Debtor has not found employment.

In addition, the UST notes that during the six months before filing for bankruptcy the Debtor received $16,664.59 in deposits to her bank account and $14,025.00 in electronic payments to several credit card accounts. However, the Debtor never listed this income in her schedules or Statement of Financial Affairs. These facts indicate that "the debtor's statement of income and expenses is misrepresentative of the debtor's financial condition." *See id.*

Furthermore, the UST has presented evidence indicating that the Debtor created a false sense of financial solvency by lying to at least one potential creditor (claiming that she was employed by Straight Edge Productions and earning $80,000 per year) in order to obtain additional credit. The Debtor has never challenged these allegations. This fraudulent activity is "egregious behavior" that fur-

ther indicates bad faith is present. *See Leavitt,* 171 F.3d at 1224.

The Debtor claims that her history of credit card spending is not disproportionate to her income because, based on two "informal interviews" with potential employers (which never resulted in offers of employment), she has an "earning capacity" "well in excess of $6,250 per month." This argument, however, is not convincing because the Debtor's "earning potential" is irrelevant. The appropriate question is whether the Debtor purchased consumer goods on credit in excess of her ability to pay for them. *See Price,* 353 F.3d at 1139–1140. This is clearly the case here. The Debtor has had no income since 2004. She has had only two "informal" job interviews since then. And, she has used credit cards to purchase consumer goods and services in an amount that is at least five times greater than her highest reported annual income. Regardless, even if this Court accepts the Debtor's contentions concerning her "earning potential" of $160,000 to $230,000 per year, that would only strengthen the evidence indicating that granting her relief would be an abuse of the provisions of Chapter 7. *See Price,* 353 F.3d at 1139–1140 (stating that it would be an abuse of Chapter 7 to grant relief to a debtor who is likely to have "sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims").

The Debtor also states that there is no evidence that her "proposed family budget is excessive or extravagant" but "to the contrary, her monthly expenses are less than $1000." However, this contention is disingenuous. The Debtor has not, on average, spent less than $1200 per month in the nearly 18 months before she filed for bankruptcy. In fact, during early 2006 she

spent, on a monthly basis, nearly three times her "proposed budget".

There is also additional evidence of bad faith. In December 2005, before the Debtor began increasing her monthly credit card spending to approximately $3000 per month, she tendered $100.00 to the Price Law Group (a bankruptcy law firm). She made an additional payment of $1,449.00 to the Price Law Group on February 28, 2006. The Debtor claims that she paid these sums to retain that law firm to act as bankruptcy counsel for her roommate, Ms. Mcgaugh, and that she never discussed bankruptcy relief with any attorney at the firm. However, the Court finds little credible evidence to support this assertion. The Debtor has not provided the Court with a copy of a retainer agreement showing that the Price Law Group represented Ms. Mcgaugh and not the Debtor. Nor has she presented a declaration made on behalf of the Price Law Group to confirm that she never spoke to any attorney there concerning the availability of bankruptcy relief. The only meaningful evidence before the Court is the Debtor's own declaration. However, given her lack of candor in her bankruptcy schedules and Statement of Financial Affairs and her history of making misrepresentations to creditors, the Court has doubts concerning the Debtor's credibility. Regardless, even if the Debtor's claims are true they (at a minimum) indicate that the Debtor was cognizant of the possibility of bankruptcy relief when she began to dramatically increase her credit card spending and incurred at least $13,531.52 in credit card debt for non-essential consumer goods in only four months. According to the Debtor's bankruptcy schedules and Statement of Financial Affairs (which she continues to claim are accurate), the Debtor incurred all of these expenses without any source of income.

In short, the Court finds that granting relief to the Debtor in this case would be an abuse of the provisions of Chapter 7 of the Bankruptcy Code because the Debtor has filed her petition in bad faith. The Debtor is seeking more than a "fresh start". She is seeking in impermissible "head start" at the expense of her creditors. *See In re Vangen,* 334 B.R. 241, 245 (Bankr.W.D.Wis.2005) (citing *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

### C. The UST's Request for a 180–Day Bar

██ The UST also requests that the Court enter an order barring the Debtor from refiling another Chapter 7 petition for 180 days. The Debtor opposes the imposition of such a bar, arguing that it is not warranted under § 109 of the Bankruptcy Code. The Court, however, finds that a bar against refiling another Chapter 7 petition is appropriate under 11 U.S.C. § 349.

██ In relevant part, § 349 provides that: "*Unless the court, for cause, orders otherwise,* the dismissal of a case under this title [the Bankruptcy Code] does not ... prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in section 109(g) of this title." 11 U.S.C. § 349(a)(emphasis added). As its plain language suggests, § 349 gives a court authority to "sanction a debtor for cause by imposing a bar against re-filing." *In re Grischkan,* 320 B.R. 654, 661 (Bankr. D.Ohio 2005). This Court finds that filing one Chapter 7 petition in bad faith is sufficient "cause" under 11 U.S.C. § 349 to impose a 180–day bar against refiling another Chapter 7 petition. Otherwise, the Debtor would be free to file another Chapter 7 petition within days of the dismissal of this case for bad faith. Such a result is not consistent with the goal of limiting

abuse of the bankruptcy system that underlies § 707(b)(3)(A).

### IV. Conclusion

The Court finds that the each of the Debtor's evidentiary objections is without merit and that granting her relief would be an abuse of the provisions of Chapter 7 because she filed her petition in bad faith. Furthermore, the Court concludes that filing one Chapter 7 petition in bad faith is sufficient "cause" under 11 U.S.C. § 349 to impose a 180–day bar against refiling another Chapter 7 petition. Accordingly, the Court overrules the evidentiary objections, grants the Motion, dismisses the Debtor's case, and orders that she be barred from filing another Chapter 7 petition for 180 days.